[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 142.]

**HENLEY ET AL., APPELLEES, *v*. CITY OF YOUNGSTOWN BOARD OF ZONING APPEALS; ST. BRENDAN CHURCH ET AL., APPELLANTS.**

[Cite as *Henley v. Youngstown Bd. of Zoning Appeals*, 2000-Ohio-493.]

*Municipal corporations—Zoning—Conversion of portion of former convent into apartments for homeless women and their children—Accessory use permit granted by board of zoning appeals—Trial court's affirmance of board's grant of accessory use permit reinstated.*

(No. 99-1520—Submitted May 24, 2000—Decided October 4, 2000.)

APPEAL from the Court of Appeals for Mahoning County, No. 97-CA-249.

————————————

{¶ 1} This zoning dispute arose from the efforts of the Ursuline Sisters of Youngstown (hereinafter "Sisters") to convert a portion of the former St. Brendan Convent at 145 Glenellen Avenue in Youngstown into apartments for homeless women and their children.

{¶ 2} The Sisters are a society of Catholic nuns who have served the Youngstown area for over a century. As part of their mission, the Sisters assist disadvantaged members of the Youngstown population, especially women and children. With the support of the Catholic Diocese of Youngstown ("Diocese"), the Sisters own and operate an independent, nonprofit corporation on Youngstown's north side called Beatitude House, which provides transitional housing and support for homeless women. The Sisters proposed expanding that program into Youngstown's west side by converting a portion of the former St. Brendan Convent building, located at 145 Glenellen Avenue, into transitional apartments.

{¶ 3} The Diocese owns the land upon which the former convent sits—the city block bounded by Glenellen, Connecticut, Schenley, and Oakwood Avenues.

The property has been continuously possessed, maintained, and operated by a diocesan parish named St. Brendan's. The Diocese supported the Sisters' plans for the former convent as a potential "new and viable use" for the former convent.

{¶ 4} The diocesan property has been put to various religious and educational uses over the years. A church and school were built there in 1924, and the convent followed in the mid 1950s. Up to fifteen nuns lived in the convent until 1993. Originally, all three buildings on the property straddled more than one lot, but in 1997 (during the pendency of this case) the property was replatted so that the church, school, and former convent building are all currently situated on a single lot. The Youngstown City School District has been a tenant of the Diocese, using part of the former convent building for preschool classes.

{¶ 5} The property concerned is zoned Single Family Residential, R-7.2, under Section 2, Article IV of the Youngstown City Zoning Ordinance. This zoning classification permits uses for churches and other places of worship, as well as for "accessory uses"—which Article I of the ordinance defines as "use[s] customarily incidental and subordinate to the principal use or building and located on the same lot with such principal use or building."

{¶ 6} The Sisters proposed converting fifteen existing bedrooms on the second floor of the former convent into five residential apartments. Four of the apartments would serve as transitional housing for the homeless women and children whom the sisters accepted for participation in the Beatitude House program, with the fifth apartment to be occupied by a resident manager. In addition to the transitional-housing program, the Sisters proposed placing the "Potter's Wheel" job-preparation program on the first floor of the former convent.

{¶ 7} In late 1996, the St. Brendan's Parish Council unanimously endorsed the Sisters' plans. But in order to receive federal grant money to fund the proposals, the Sisters were required to obtain a letter from the local zoning authority demonstrating that the programs would comply with applicable zoning laws, and

Sister Scheetz requested such a letter from the city. The city zoning officer denied the request, and Beatitude House appealed to the Youngstown Board of Zoning Appeals, claiming that its proposed uses for the former convent qualified as accessory uses under the zoning ordinance.

{¶ 8} In February 1997, the board conducted a hearing on the appeal. Public notice of the hearing alerted members of the surrounding community that "[t]he basis of the appeal is that the proposed use is accessory to the existing use." After hearing testimony from the Sisters, counsel, concerned neighbors, and other interested parties, the board deferred its decision, reconvened after considering a legal memorandum from the assistant law director, and then granted the requested accessory use permit "based on Federal and State law."

{¶ 9} Susan Henley and N. Glenellen Blockwatch ("Henley"), nearby property owners concerned about the proposal's potential impact on their neighborhood, timely appealed the board's decision to the Mahoning County Court of Common Pleas. Beatitude House and St. Brendan Roman Catholic Parish ("St. Brendan Church") intervened in Henley's appeal.

{¶ 10} In her first assignment of error, Henley claimed that the board of zoning appeals erred when it granted the accessory use permit because, Henley alleged, the board's decision was based in part on the Religious Freedom Restoration Act of 1993, Section 2000bb *et seq.*, Title 42, U.S.Code ("RFRA")— which the United States Supreme Court declared unconstitutional approximately four months following the board's decision to grant the permit. *Boerne v. Flores* (1997), 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. According to Henley, that decision by the United States Supreme Court indicated that RFRA could "no longer give the Church the unrestricted power to build and use land in any manner they wish under the guise of 'religious freedom.' "

{¶ 11} In her second assignment of error, Henley claimed that inadequate notice of the board hearing deprived concerned neighbors of their constitutional

right to due process. The "Notice of Public Hearing" disseminated by the board provided that "[a]n appeal has been made to the Board of Zoning Appeals * * * for a *variance* from the minimum requirements of the Zoning Ordinance." (Emphasis added.) In a subsequent paragraph, the notice provided that "[t]he basis of the appeal is that the proposed use is *accessory* to the existing use." (Emphasis added.) Henley believed that the board's notice misled the surrounding property owners by suggesting that Beatitude House was seeking a variance rather than a permit for an accessory use.

{¶ 12} Henley also argued that the nuns' proposed use did not meet the definition of "accessory use" contained in Youngstown's zoning ordinance. Section 12.10 of the city zoning ordinance requires accessory uses to be both "customarily incidental and subordinate to the principal use or building" *and* "located on the same lot as such principal use or building." Henley claimed that Beatitude House would satisfy neither definitional requirement.

{¶ 13} Finally, in her fourth assignment of error, Henley argued that Section 80, Article VII (hereinafter "Section 80") of the city zoning ordinance expressly prohibited the use of an accessory building as a dwelling unit in residential districts. Henley maintained that, therefore, even if Beatitude House satisfied the general definition of an "accessory use" under Article I of the ordinance, the program would nonetheless directly violate Section 80's separate prohibition of dwelling units in accessory buildings located in residential districts.

{¶ 14} The city of Youngstown, Beatitude House, and St. Brendan Church (herein referred to collectively as "Beatitude House") filed a joint response, urging the common pleas court to affirm the board's decision. In addition to responding to Henley's assignments of error, Beatitude House argued that a reversal of the board's decision would violate the First Amendment to the United States Constitution by infringing the Sisters' right to freely exercise their religion. Denial of the accessory use permit, Beatitude House contended, would substantially

4

burden the Sisters' religious practices—without compelling reason—by preventing them from accomplishing their customary mission of service to the disadvantaged.

{¶ 15} The common pleas court affirmed the board's grant of the accessory use permit. The court conceded that, to the extent the board relied on RFRA to support its decision to grant the permit, that reliance was unlawful and erroneous due to RFRA's unconstitutionality. Nevertheless, the court determined that the board's public notice was sufficient and that the proposed programs were permissible accessory uses. Citing federal free-exercise cases, the common pleas court determined that no compelling government or neighborhood interest justified a refusal of the permit. The common pleas court did not address Henley's fourth assignment of error concerning Section 80's apparent prohibition of dwellings in accessory buildings in residential areas.

{¶ 16} Henley appealed the decision of the common pleas court to the Mahoning County Court of Appeals. In a single assignment of error, Henley claimed that the common pleas court abused its discretion when it affirmed the board's grant of the permit because the proposed use of the convent as a dwelling was prohibited by Section 80 of the Youngstown zoning ordinance. In a split decision, the court of appeals sustained Henley's assignment of error and reversed the decision of the common pleas court.

{¶ 17} The majority of the appellate panel conceded that "social programs of a church, such as the ones in this case, *are accessory uses* in that they are customarily incidental to the principal use." (Emphasis added.) Nevertheless, the court determined that under Section 80 of the zoning code, "accessory buildings cannot contain dwelling units in any residential district unless the ordinance specifies an exception." The court of appeals also rejected Beatitude House's free-exercise claim, concluding that Beatitude House had no private right to ignore the generally applicable zoning law precluding dwellings in accessory buildings.

**{¶ 18}** Because Henley did not contest the job-preparation aspect of the Sisters' plans, and disputed only the Sisters' proposed use of the former convent as a residence, the court of appeals limited the scope of its decision to the transitional-housing project. Accordingly, the permit for the Potter's Wheel job-preparation program remained valid following the decision of the court of appeals, and is not at issue in this appeal.

**{¶ 19}** The cause is now before this court upon the allowance of a discretionary appeal.

———————————

*Atway, Cochran & Rafidi, L.L.C.,* and *Scott R. Cochran,* for appellees.

*Mary Beth Houser,* for appellant St. Brendan Church.

*Raymond M. Tarasuck, Jr.,* for appellant Beatitude House.

*Patricia Dougan*, urging reversal for *amicus curiae*, Northeast Ohio Legal Services.

———————————

**COOK, J.**

**{¶ 20}** Appellants contend that the court of appeals substituted its judgment for that of the common pleas court when it reversed the decision of the common pleas court in this administrative appeal, and that the denial of the accessory use permit for the transitional-housing proposal unconstitutionally infringes appellants' right to freely exercise their religion. We determine that the court of appeals did not exceed the scope of appellate review under R.C. 2506.04 when it reviewed the decision of the common pleas court in this case. Nevertheless, we differ from the court of appeals because we conclude that the common pleas court did not err when it failed to apply Section 80 to preclude appellants' proposed use of the former convent. Because we reverse the decision of the court of appeals and reinstate the decision of the common pleas court, we need not address appellants' constitutional claims.

6

I

**{¶ 21}** The question at the center of this appeal is whether Section 80's General Requirements preclude the use of a portion of the former convent as residential apartments. The common pleas court did not address Section 80 in its decision affirming the board's order, even though Henley expressly raised Section 80 in her fourth assignment of error to that court. The court of appeals *did* expressly apply Section 80, concluding that even though Beatitude House would qualify as an "accessory use" under the general definition contained in Article I of the zoning ordinance, Section 80's General Requirements prohibited the use of the former convent as a dwelling due to the property's location in a residential zone. Appellants here contend that the court of appeals substituted its judgment for that of the common pleas court when it reversed the decision of the common pleas court on this basis. Since the court of appeals did not discuss the standard of review applicable to administrative appeals taken under R.C. 2506.04, we begin our analysis by reviewing that standard.

A. The Limited Standard of Appellate Review in an R.C. 2506.04 Appeal

**{¶ 22}** Construing the language of R.C. 2506.04, we have distinguished the standard of review to be applied by common pleas courts and courts of appeals in R.C. Chapter 2506 administrative appeals. The common pleas court considers the "whole record," including any new or additional evidence admitted under R.C. 2506.03, and determines whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence. See *Smith v. Granville Twp. Bd. of Trustees* (1998), 81 Ohio St.3d 608, 612, 693 N.E.2d 219, 223, citing *Dudukovich v. Lorain Metro. Hous. Auth.* (1979), 58 Ohio St.2d 202, 206-207, 12 O.O.3d 198, 201-202, 389 N.E.2d 1113, 1116-1117.

**{¶ 23}** The standard of review to be applied by the court of appeals in an R.C. 2506.04 appeal is "*more limited* in scope." (Emphasis added.) *Kisil v.*

*Sandusky* (1984), 12 Ohio St.3d 30, 34, 12 OBR 26, 30, 465 N.E.2d 848, 852. "This statute grants a more limited power to the court of appeals to review the judgment of the common pleas court only on 'questions of law,' which does not include the same extensive power to weigh 'the preponderance of substantial, reliable and probative evidence,' as is granted to the common pleas court." *Id.* at fn. 4. "It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. * * * The fact that the court of appeals, or this court, might have arrived at a different conclusion than the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 261, 533 N.E.2d 264, 267.

### B. The Standard of Review Applied by the Court of Appeals

{¶ 24} In their third proposition of law, appellants contend that the court of appeals misapplied the foregoing standards in this administrative appeal. In order to resolve this issue, we must determine what standard of review the court of appeals actually applied. Our inquiry is complicated by the fact that the court of appeals' opinion lacks any reference to R.C. 2506.04 or to any judicial decisions discussing the proper standard of review in administrative appeals.

{¶ 25} Nevertheless, the court of appeals' opinion focuses on the application of Section 80 to undisputed facts in the record. The application of Section 80 to the facts is a "question of law"—"[a]n issue to be decided by the judge, concerning the application or interpretation of the law." Black's Law Dictionary (7 Ed.1999) 1260. That the application of Section 80 to this case involved a consideration of facts or the evidence did not turn this question into a question of fact. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph two of the syllabus.

{¶ 26} Moreover, Henley's assignment of error to the court of appeals asserted that the common pleas court had "abuse[d] [its] discretion" by failing to preclude the proposed use on the basis of Section 80. This court has held that in administrative appeals under R.C. 2506.04, "[w]ithin the ambit of 'questions of law' for appellate court review would be abuse of discretion by the common pleas court." *Kisil, supra,* at fn. 4. Accordingly, the court of appeals did not exceed the proper scope of review under that statute when it sought to determine whether Section 80 applied to the undisputed facts in the record, or whether the common pleas court abused its discretion by failing to apply Section 80. R.C. 2506.04; see, also, *Kisil, supra.*

{¶ 27} Our conclusion that the court of appeals did not exceed the standard of review under R.C. 2506.04 does not preclude us from reaching a different *result* than the court of appeals on the issue of whether the common pleas court did, in fact, err by failing to prohibit the Sisters' proposal on the basis of Section 80. Accord *Solid Rock Ministries Internatl. v. Monroe Bd. of Zoning Appeals* (June 5, 2000), Butler App. No. CA99-10-170, unreported, 2000 WL 744584 (holding that, although common pleas court applied the proper standard of review to review decisions of zoning boards, common pleas court nevertheless misapplied the law when it found that prior permit issued by board disallowed proposed group home for unwed pregnant teenagers, when prior permit disallowed only schools and the group home was a permitted church use). Because we determine, *infra,* that Section 80 does not preclude the Sisters' proposed use of the convent, we conclude that the court of appeals erred when it reversed the decision of the common pleas court on this basis.

II

{¶ 28} Article I of the Youngstown ordinance, after providing a guide to "Interpretation of Certain Terms and Words," includes a "List of Definitions." Section 12.10 of that list provides that an "Accessory Use or Building" is "[a] use customarily incidental and subordinate to the principal use or building and located on the same lot with such principal use or building."

{¶ 29} The court of appeals concluded, and we agree, that "social programs of a church, such as the ones in this case, *are accessory uses in that they are customarily incidental to the principal use*." (Emphasis added.) The character of uses and structures that courts have deemed accessory to religious uses has varied widely. See, generally, Annotation, What Constitutes Accessory or Incidental Use of Religious or Educational Property Within Zoning Ordinance (1982), 11 A.L.R. 4th 1084, 1086, citing 2 Anderson, American Law of Zoning 2d, Section 12.26.[1] Several courts have specifically permitted residential accommodations in church buildings as accessory uses. See, *e.g., St. John's Evangelical Lutheran Church v. Hoboken* (1983), 195 N.J.Super. 414, 479 A.2d 935 (shelter for homeless); *Beit Havurah v. Norfolk Zoning Bd. of Appeals* (1979), 177 Conn. 440, 418 A.2d 82 (unrestricted overnight accommodations in synagogue). Most recently, the Twelfth District Court of Appeals determined that a home for unwed pregnant teenage girls, which included prenatal care, life skills training, and a spiritual education, was an integral part of a church's missionary purposes. *Solid Rock Ministries Internatl., supra.* Based on the foregoing, we agree with the court of appeals that Beatitude House would be "customarily incidental" to the principal use of the diocesan

---

1. Permissible accessory uses have ranged from activities buildings (*Elkhart Cty. Bd. of Zoning Appeals v. New Testament Bible Church, Inc.* [Ind.App.1980], 411 N.E.2d 681) to playgrounds (*Cash v. Brookshire United Methodist Church* [1988], 61 Ohio App.3d 576, 573 N.E.2d 692; *Siegert v. Luney* [1985], 111 A.D.2d 854, 491 N.Y.S.2d 15), to parking lots (*Diocese of Rochester v. Planning Bd. of Brighton* [1956], 1 N.Y.2d 508, 154 N.Y.S.2d 849, 136 N.E.2d 827).

property as a Catholic church and would satisfy Article I's definition of "Accessory Use or Building."

{¶ 30} Article VII—the article containing Section 80's Supplemental Regulations—provides a different definition of "Accessory Building" from the one appearing in Article I's "List of Definitions." Section 80, entitled "Regulation of Accessory Buildings in Residential Districts," more specifically provides that "[i]n residential districts, 'Accessory Building' means a structure constructed or installed on, above, or below the surface of a parcel, which is located on the same lot as a principal use or structure, and which is subordinate to or serves the principal use or structure, [and] is subordinate in area to the principal use or structure. 'Accessory Building' includes *any building of a subordinate nature attached to or detached from a principal structure or use, including but not limited to sheds, garages and greenhouses*." (Emphasis added.)

{¶ 31} After citing Section 80's definition of "Accessory Building," the court of appeals seized on the following selected language from Section 80's "General Requirements" to reverse the decision of the common pleas court and deny the Sisters' proposed use: "In residential districts, except as otherwise provided in this Ordinance, *an accessory building shall be permitted in association with a principal use or structure provided that*:

" * * *

"2. *It shall not contain or be used as a dwelling unit*." (Emphasis added.)

Relying on these provisions of the ordinance, the court of appeals came to the following conclusions: "Accessory uses are permitted. These accessory uses may occur in accessory buildings. However, accessory buildings cannot contain dwelling units in any residential district unless the ordinance specifies an exception. * * * Accordingly, * * * St. Brendan's Church may not allow Beatitude House to remodel its former convent into apartments."

**{¶ 32}** Implicit in the court of appeals' syllogism is the view that all separate structures in which accessory uses occur, if located in a residential area, are necessarily "accessory buildings" embraced by Section 80's prohibition of dwelling units in accessory buildings. We do not share this view, and determine on this question of law that the common pleas court did not err when it failed to apply Section 80 to preclude renovation of the former convent.

**{¶ 33}** For one, Section 80's definition of "Accessory Building," unlike the general definition of "Accessory Use or Building" that appears in Article I, expressly refers to "sheds, garages and greenhouses." This list of structurally similar storage- or workshop-type buildings shows that the drafters of the zoning code had a particular type of structure in mind when they desired to prohibit dwelling units in "accessory buildings" in residential zones. Our conclusion is reinforced by Article V's "Schedule of Uses," which refers to accessory uses "*such as* garages, greenhouses, or tool shed." (Emphasis added.) If the drafters had not intended to limit the purview of Section 80 to this type of structure, and wished to render Section 80's prohibition applicable to *all* structures in which accessory uses happen to occur, they could easily have done so. But they did not. Instead of referring back to Article I's general definition of "Accessory Use or Building," Section 80 limits the reach of its General Requirements by making them applicable to a narrower category of "Accessory Buildings"—a category defined and described with reference to sheds, garages, and greenhouses.

**{¶ 34}** Though the nonexhaustive list of structures in Section 80's definition of "Accessory Building" is preceded by the phrase "including but not limited to," the canon of *ejusdem generis*, which has been cited with approval by this court, suggests that the general or unstated terms in the definition should be determined with reference to the terms expressly included. *State v. Hooper* (1979), 57 Ohio St.2d 87, 89-90, 11 O.O.3d 250, 252, 386 N.E.2d 1348, 1350; see, also, Miller, Pragmatics and the Maxims of Interpretation (1990), 1990 Wis.L.Rev. 1179, 1199-

1200. In *Hooper,* we noted that the canon of *ejusdem generis* is particularly applicable to statutory language that must be strictly construed. *Hooper*, 57 Ohio St.2d at 89, 11 O.O.3d at 251-252, 386 N.E.2d at 1350, fn. 4. Section 80, since it "impose[s] restrictions upon the use, management, control, or alienation of private property," should be strictly construed. See *State ex rel. Moore Oil Co. v. Dauben* (1919), 99 Ohio St. 406, 124 N.E. 232, paragraph one of the syllabus. Accordingly, the common pleas court did not err to the prejudice of appellees when it disregarded this regulation aimed at "sheds, garages, and greenhouses" in the context of this case.

**{¶ 35}** Furthermore, the court of appeals cited only the second of Section 80's five enumerated General Requirements to support its reversal of the common pleas court. The four General Requirements that the court of appeals omitted from its analysis support appellants' view that Section 80's prohibitions apply to small, shed-like structures:

"1. The total area occupied by accessory buildings shall not exceed * * * thirty-five percent of the gross floor area of the principal structure or * * * 770 square feet. *One shed*, not to exceed 120 square feet, shall be permitted in excess of the above area limits.

" * * *

"3. *It shall not exceed eighteen (18) feet at the highest point, and the side walls shall not exceed 12 feet in height*.

"4. It shall meet all *yard requirements* of this zoning ordinance.

"5. *If not located in the rear yard*, it shall be an integral part of the principal building to which it is accessory." (Emphasis added.)

**{¶ 36}** Courts are to read words and phrases in context. See R.C. 1.42. When the phrase "it shall not contain or be used as a dwelling unit" is read in its proper context, that context—like the canon of *ejusdem generis*—only reinforces our conclusion that Section 80's General Requirements apply to structures in

residential zones resembling those specifically enumerated in Section 80's Definition of "Accessory Building," and not to the former convent at issue in this case.

{¶ 37} The court of appeals stated that it resisted Beatitude House's invitation to "interpret the ordinance instead of simply applying it." But in order to apply Section 80 to the convent here, or to determine that the common pleas court abused its discretion by failing to apply it, the court of appeals necessarily interpreted Section 80 broadly, so that the prohibitions contained in its General Requirements would embrace a structure completely unlike those listed in Section 80's definition of "Accessory Building." Because zoning ordinances deprive property owners of certain uses of their property, however, they will not be extended to include limitations by implication. *Van Camp v. Riley* (1984), 16 Ohio App.3d 457, 16 OBR 539, 476 N.E.2d 1078. See, also, *Univ. Circle, Inc. v. Cleveland* (1978), 56 Ohio St.2d 180, 184, 10 O.O.3d 346, 348, 383 N.E.2d 139, 141; *Dauben*, *supra*, 99 Ohio St. 406, 124 N.E. 232, paragraph one of the syllabus; 3 Anderson, American Law of Zoning 3d (1986) 7-8, Section 16.02.

{¶ 38} Section 80's General Requirements, though they apply to the residential zone in which the former convent is located, prohibit dwelling units in sheds, garages, greenhouses, or other similar structures. The common pleas court did not err to the prejudice of appellees when it failed to apply Section 80 to prevent the Sisters from realizing their transitional-housing proposal at the former convent—a proposal that the board approved as a permissible accessory use.

{¶ 39} In their first and second propositions of law, appellants submit that when the court of appeals reversed the decision of the common pleas court and denied the accessory use permit, this infringed appellants' right to freely exercise their religion—a right independently guaranteed by the First Amendment to the United States Constitution and Section 7, Article I of the Ohio Constitution. Due

to our disposition of appellants' third proposition of law, appellants' constitutional claims are moot.

{¶ 40} For the foregoing reasons, we reverse the judgment of the court of appeals and reinstate the decision of the trial court.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK and PFEIFER, JJ., concur.

F.E. SWEENEY and LUNDBERG STRATTON, JJ., dissent.

_____

**LUNDBERG STRATTON**, **J., dissenting.**

{¶ 41} I agree that the Sisters' proposed use of the convent may be incidental to the church's primary use of the property. I also believe that providing assistance to poverty-stricken mothers is a worthy endeavor. Nevertheless, I believe that the plain language of the Youngstown Zoning Ordinance precludes the Sisters from using the convent as a dwelling.

### A. Zoning Intent

{¶ 42} The zoning ordinance seeks to regulate, among other things, population density in residential districts. Regulation of population density has been held to be a valid zoning objective. See *State ex rel. Grant v. Kiefaber* (1960), 114 Ohio App. 279, 19 O.O.2d 207, 181 N.E.2d 905. Presumably to assist residential districts in maintaining their population density levels, Section 80 of the zoning ordinance also precludes "accessory buildings" from being used as dwelling units.

{¶ 43} The church does not dispute that the convent is an accessory building that is located in a residential, single-family, R-7.2 district. Therefore, allowing the convent to be converted into a dwelling would be in clear conflict with the purpose of maintaining population density, not only because it would allow an accessory building that contains a dwelling, but also because it would allow a multifamily dwelling in a single-family district. Persons in these neighborhoods have a

justifiable expectation that valid zoning regulations will be enforced to preserve the nature of their neighborhood. Accordingly, I believe that the zoning ordinance precludes the conversion of the convent into apartments.

### B. Free Exercise Clause

{¶ 44} Although the issue is not addressed by the majority, the brief of the Beatitude House and the church argues that enforcement of the zoning laws to preclude the convent from being used for housing for participants in the Potter's Wheel Project would violate the church's right to free exercise of religion. I disagree.

{¶ 45} The Free Exercise Clause prohibits the government from discriminating against someone solely because of religious beliefs, but it does not prohibit the government from enforcing religious-neutral laws of general applicability. *Oregon Dept. of Human Resources, Emp. Div. v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876. The zoning ordinance merely divides property within the city of Youngstown into separate districts with different land use regulations for various enumerated religious-neutral purposes. Section 80 does not prevent the Sisters from providing assistance to the women and their children; it merely prevents the Sisters from housing these families on this particular piece of property.

{¶ 46} Zoning laws often involve striking a balance between competing interests. In this case, the property is zoned single-family to preserve the character of a family neighborhood. Allowing the convent to be used for a multifamily dwelling would infringe on the neighbors' right to preserve the quality of their community. The zoning ordinance has nothing to do with inhibiting the laudable goal of aiding mothers in need, but everything to do with preserving the nature of the neighborhood as the zoning ordinance intended. Even applying the Ohio test for the free exercise of religion as set out in *Humphrey v. Lane* (2000), 89 Ohio St.3d 62, 728 N.E.2d 1039, I would find that Section 80 furthered a compelling

16

state interest of preserving the nature of the neighborhood. I would also find that Section 80 achieved that interest using the least restrictive means because the housing for the Potter's Wheel Project participants could be located anywhere in Youngstown where the zoning permitted such a use. Accordingly, I believe that enforcement of the zoning in this case does not violate the Free Exercise Clause.

## C. *Ejusdem Generis*

{¶ 47} Article IV of the zoning ordinance allows the following use in the R-7.2, single-family residential district:

"Accessory uses and structures incidental to any permitted residential use, such as garages, greenhouses or tool sheds."

{¶ 48} In 1990, the Youngstown City Council passed Section 80 of the Supplementary Regulations to the ordinance. Section 80, entitled "Regulation of Accessory Buildings in Residential Districts," states:

"Purpose: It is the purpose of this Section to regulate accessory buildings in residential districts in order to promote the public health, safety and welfare. It is the intent of this Section to permit buildings that are compatible with principal uses and harmonious with the uses upon adjacent properties.

"Definition: In residential districts, 'Accessory Building' means a structure constructed or installed on, above, or below the surface of a parcel, which is located on the same lot as a principal use or structure, and which is subordinate to or serves the principal use or structure, [and] is subordinate in area to the principal use or structure. 'Accessory Building' includes any building of a subordinate nature attached to or detached from a principal structure or use, including but not limited to sheds, garages and greenhouses.

"General Requirements

"In residential districts, except as otherwise provided in this Ordinance, an accessory building shall be permitted in association with a principal use or structure provided that:

"1. The total area occupied by accessory buildings shall not exceed: a) thirty-five percent of the gross floor area of the principal structure or * * * b) 770 square feet. One shed, not to exceed 120 square feet, shall be permitted in excess of the above area limits.

"2. *It shall not contain or be used as a dwelling unit*.

"3. It shall not exceed eighteen (18) feet at the highest point, and the side walls shall not exceed 12 feet in height.

"4. It shall meet all the yard requirements of this zoning ordinance.

"5. If not located in the rear yard, it shall be an integral part of the principal building to which it is an accessory." (Emphasis added.)

{¶ 49} Applying *ejusdem generis*, the majority holds that Section 80 applies only to "small, shed-like structures," and therefore Section 80 does not apply to the convent. The majority reasons that Section 80's reference to "sheds, garages and greenhouses" indicates that the drafters intended to limit Section 80's application to this type of small structure. The majority finds that the "General Requirements" of Section 80 also support this limitation on Section 80's application. I disagree.

{¶ 50} Under the rule of statutory construction of *ejusdem generis,* "[w]here general words *follow* the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." (Emphasis added.) *Light v. Ohio Univ.* (1986), 28 Ohio St.3d 66, 68, 28 OBR 165, 167, 502 N.E.2d 611, 613, citing *State v. Aspell* (1967), 10 Ohio St.2d 1, 39 O.O.2d 1, 225 N.E.2d 226. "For example, in the phrase *horses, cattle, sheep, pigs, goats, or any other barnyard animal*, the general language *or any other barnyard animal* * * * would probably be held to include only four-legged, hoofed mammals." (Emphasis *sic*.) Black's Law Dictionary (7 Ed.1999) 535.

18

**{¶ 51}** "The reason behind this principle of statutory construction is that, if the Legislature had meant the general words to be applied without restriction, it would have used a general term only, rather than specifically enumerating certain persons, subjects, or objects followed by general terminology." *State v. Greenburg* (Sept. 30, 1986), Franklin App. No. 86AP-286, unreported, at 5-6, 1986 WL 11090.

**{¶ 52}** The majority finds that the language "sheds, garages and greenhouses" in Section 80 evidences an intent that the drafters of this section intended it to prohibit only "storage- or workshop-type buildings."

**{¶ 53}** However, the language "sheds, garages and greenhouses" does not precede, but rather follows, the definition of accessory building in Section 80, making the rule of *ejusdem generis* inapplicable. See, *e.g., Bascon Inc. v. de la Vega* (Nov. 19, 1999), Hamilton App. No. C-990172, unreported, 1999 WL 1043731. Thus, I believe that the drafters did not intend to limit the definition of accessory building, because they used a general term to define accessory building rather than a series followed by general language. *Greenburg, supra.*

**{¶ 54}** Moreover, words such as "other," "other thing," "others," or "any other" that follow the enumerated series signal that the rulemaking authority is seeking to limit the general words to the class of things listed in the enumerated series. *Glidden Co. v. Glander* (1949), 151 Ohio St. 344, 350, 39 O.O. 184, 187, 86 N.E.2d 1, 4. For example in *Light v. Ohio Univ.,* the court construed R.C. 1533.18(B), which states:

" 'Recreational user' means a person to whom permission has been granted * * * to enter upon premises to hunt, fish, trap, camp, hike, swim, or engage in *other* recreational pursuits." (Emphasis added.)

**{¶ 55}** The court in *Light* applied *ejusdem generis* and limited the phrase "other recreational pursuits" to the same general class of the items listed in the preceding enumerated series, *i.e.,* hunting, fishing, etc.

**{¶ 56}** Unlike the statutory language addressed in *Light,* Section 80 does not contain language such as "other," which typically signifies an intent to limit a general term to the class of terms in the proceeding enumerated series. Instead, the words "sheds, garages and greenhouses" is preceded by the phrase "including but not limited to." The language "including but not limited to" is recognized by courts as indicating a nonexhaustive list of examples. See *In re Smallwood* (Jan. 26, 1998), Butler App. No. CA97-02-041, unreported, 1998 WL 24343; *In re Estate of Lewis* (July 23, 1999), Athens App. No. 98CA17, unreported, 1999 WL 595458; *State v. Barnett* (Feb. 8, 2000) Seneca App. No. 13-99-48, unreported, 2000 WL 140850; *K-Swiss, Inc. v. Cowens Sports Ctr., Inc.* (Nov. 8, 1995), Greene App. No. 95-CA-48, unreported, 1995 WL 655945. Thus, I would find that Section 80's reference to "sheds, garages and greenhouses" is merely a nonexhaustive list of examples of the types of accessory buildings that may be erected in a residential district and not a limitation of the definition of an accessory building.

**{¶ 57}** Finally, I believe that Section 80's language intends an expansive definition for the term "accessory building." The *definition* portion of Section 80 reads: " 'Accessory Building' includes *any* building of a subordinate nature attached to or detached from a principal structure or use, including but not limited to sheds, garages and greenhouses." (Emphasis added.) If the drafters of Section 80 had wished to limit its application to shed-like structures, it would have defined accessory building as a shed-like structure, but it did not. Instead Section 80 states that "accessory building" includes "any building of a subordinate nature." "Any" is defined as "one indifferently out of more than two: one or some indiscriminately of whatever kind." Webster's Third New International Dictionary (1986) 97. Thus, "any" is not a word of limitation, but rather suggests an expansive definition of an accessory building. Therefore, I do not believe that Section 80 was intended to apply only to small, shed-like structures.

20

**{¶ 58}** The majority also finds that the "General Requirements" of Section 80 support the conclusion that Section 80 applies only to small shed-like structures. I disagree.

**{¶ 59}** Contrary to the majority's assertion otherwise, only two of the five General Requirements address the size of the accessory building and thus lend even plausible support to the majority.[2] More important, the General Requirements are merely a component of Section 80 that provides some limitations on the types of accessory buildings that *can* be erected in a residential district, as opposed to limiting the applicability of Section 80. Finally, it is the definition portion of Section 80 that actually defines the term accessory building, which, as I determined above, provides an expansive definition of the term "accessory building." Thus, I do not believe that the General Requirements limit Section 80's application to small, shed-like structures.

**{¶ 60}** For all the aforementioned reasons, I believe that there is no intent on the part of the drafters of Section 80 to limit its application to small, shed-like structures. Therefore, I believe that the rule of *ejusdem generis* should not be applied in this case because it defeats Section 80's ban on dwelling units in accessory buildings in residential neighborhoods. *State v. Warner* (1990), 55 Ohio St.3d 31, 62, 564 N.E.2d 18, 47 ("the rule of *ejusdem generis* should not be invoked to defeat the obvious purpose of a legislative enactment").

---

2. The first General Requirement allows a one-hundred-twenty-square-foot shed. However, this "shed" is "permitted in excess of the above area limits." The "above area limits" allow a seven-hundred-seventy-square-foot building. Thus, the first General Requirement allows a shed *and* a seven-hundred-seventy-square-foot building. Accordingly, even this language cited by the majority allows a building bigger than a shed, by its own definition.

## D. Conclusion

**{¶ 61}** Therefore, I would hold that Section 80 precludes renovation of the convent for use as a dwelling.  Accordingly, I would affirm the judgment of the court of appeals.

F.E. SWEENEY, J., concurs in the foregoing dissenting opinion.

———————————