[Cite as *Lamar Co., L.L.C. v. Beavercreek*, 2023-Ohio-964.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

|  |  |  |
|---|---|---|
| THE LAMAR COMPANY, LLC dba LAMAR ADVERTISING OF DAYTON | : | |
| | : | |
| | : | C.A. No. 2022-CA-41 |
| Appellant | : | |
| | : | Trial Court Case No. 2021 CV 0474 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas |
| CITY OF BEAVERCREEK, et al. | : | Court) |
| | : | |
| Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 24, 2023

. . . . . . . . . . .

ROBERT R. SPARKS, R. GUY TAFT, and STEPHEN E. SCHILLING, Attorneys for Appellant

STEPHEN M. MCHUGH and JOSHUA R. LOUNSBURY, Attorneys for Appellees

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} The Lamar Company, LLC, appeals from the trial court's judgment entry affirming appellee City of Beavercreek's denial of an application to install a digital-

billboard on property that is part of a commercial planned-unit development.[1]

{¶ 2} Lamar contends the trial court disregarded a city ordinance mandating that an otherwise-permitted sign, like a digital billboard, may be excluded from a planned-unit development only if certain findings are made. Absent those findings, Lamar argues that the Beavercreek city council was required to allow its digital billboard. Lamar also claims the trial court ignored the legal principle that zoning restrictions on private property cannot be extended by implication to encompass things not clearly proscribed.

{¶ 3} We conclude that the ordinance Lamar cites has no applicability to its request to erect a digital billboard and that no particular findings by the city council were required. We also conclude that governing planned-unit-development sign criteria clearly proscribed the sign Lamar sought to install. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 4} In August 2021, Lamar applied for a permit to install a digital billboard near the intersection of New Germany-Trebein Road and North Fairfield Road in Beavercreek. The proposed installation site is part of a planned-unit development (PUD) on commercially-zoned land. The commercial PUD classification was approved in 1989 following an application by the landowner. The original PUD, which encompassed 113 acres, was identified as PUD 88-18. It included various conditions and restrictions agreed to by Beavercreek and the landowner. As relevant here, PUD 88-18 contained a "Sign Plan" that identified the number, type, size, and location of permitted signs.

---

[1] The appellees herein are the City of Beavercreek and the Beavercreek city council, which actually denied Lamar's application on behalf of the city.

{¶ 5} In 1993, the landowner applied for modification of the existing PUD. The Beavercreek city council approved the requested modification. The modified PUD, identified as PUD Mod 10-93, withdrew 87.5 acres from the PUD project, leaving approximately 25.8 acres within the commercial PUD classification. Like its predecessor, the modification included a written sign program, which had been submitted by the landowner, addressing permitted signage.

{¶ 6} Lamar's application for a permit to install a digital billboard proceeded to a September 2021 hearing before the city council. During the hearing, Lamar argued that its proposed sign was permitted under Beavercreek Zoning Code (BZC) §158.159 and that it met all size and other code requirements. In response, concerns were expressed about whether the proposed digital billboard exceeded size limits found in PUD Mod 10-93 and whether it constituted an impermissible third "pylon sign" in violation of the modified PUD.

{¶ 7} At its next scheduled meeting, the city council voted to deny Lamar's application. The stated reason was that "the facts submitted with the application do not satisfy the standards and criteria set forth in the approved site plan and subsequent modifications of planned-unit development 88-18." More specifically, council members found that "[t]he application proposes to construct a third pylon sign in violation of the development's conditions of approval allowing two pylon signs in a location not approved for the development and at a height and size substantially larger than permitted."

{¶ 8} Lamar filed an administrative appeal from the city council's decision. After reviewing the administrative record and briefing from the parties, the trial court affirmed

the Beavercreek city council's decision. In a July 11, 2022 Judgment Entry and Decision on Administrative Appeal, the trial court reasoned:

Lamar urges this Court to reverse the decision issued below because, in its view, it is the provisions of Code §158.159 that control rather than those of PUD 88-18 and Mod 10/93. Lamar further argues that neither PUD 88-18 nor Mod 10/93 exclude the placement of digital billboards, and as Lamar correctly points out, when interpreting a zoning ordinance, "courts must strictly construe restrictions on the use of real property in favor of the property owner," and zoning restrictions "cannot be extended to include limitations not clearly prescribed." *Key Ads, Inc. v. City of Dayton Bd. of Zoning Appeals*, 2d Dist. Montgomery No. 26148, 2014-Ohio-4961.

The parcel at issue herein is not only subject to the zoning regulations of the underlying zoning district, but it also [is] subject to modified approved development standards contained in PUD-88 and Mod 10/93. PUD-88 contains a very specific sign plan. PUD-88 later was modified by Mod 10/93, which modified the sign plan for the project and includes clearly prescribed limitations as to the permitted signage for the project. Therefore, the Court finds the number and type of signs that may be placed on the 25.8 acres of land governed by Mod 10/93 is specifically and expressly limited by its plan language—"The program outlined below encompasses the total signage for the completed project." (*See* Mod 10/93 Decision, Attachment E).

{¶ 9} Lamar timely appealed to this court from the trial court's judgment entry affirming the Beavercreek city council's decision.

## II. Standard of Review

{¶ 10} "[I]n an administrative appeal pursuant to R.C. Chapter 2506, the common pleas court considers the whole record, including any new or additional evidence admitted under R.C. 2506.03, and determines whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." *Durell v. Spring Valley Twp. Bd. of Zoning Appeals*, 2d Dist. Greene No. 2012-CA-23, 2012-Ohio-5098, ¶ 21. An appellate court's review is more limited. Under R.C. 2506.04, an appellate court reviews a common pleas court's judgment only on "questions of law." *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147, 735 N.E.2d 433 (2000). This includes reviewing the trial court's application of law to undisputed facts. *Id.* at 148. It also includes reviewing the trial court's decision to determine whether, as a matter of law, the decision is unsupported "by a preponderance of reliable, probative and substantial evidence*," Kisil v. City of Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984), or whether the decision constitutes an abuse of discretion. *Henley* at 148.

## III. Analysis

{¶ 11} In its sole assignment of error, Lamar contends the trial court erred in upholding the Beavercreek city council's denial of its application to erect a digital billboard. Lamar raises two primary arguments. First, it contends the trial court disregarded the plain language of BZC §158.072(B)(1). Second, it claims the trial court ignored binding legal

precedent holding that zoning restrictions on the use of private property cannot be extended by implication.

{¶ 12} We begin our analysis with BZC §158.072(B)(1), which provides that a permitted use, such as a digital-billboard sign, may be excluded from a commercial PUD zoning classification only if the Beavercreek city council determines that the permitted use is inappropriate for the commercial PUD. Such an exclusion must be based on a specific finding that the excluded use:

(a) Cannot be serviced by adequate public utilities; or presents the potential for significant environmental damage and a satisfactory plan of mitigation has not been provided by the applicant; or is inconsistent with the overall character and other uses of the proposed PUD; or is inappropriate for the topography of the site; or is incompatible with surrounding legal land uses or other approved land uses; or is inconsistent with the City's Land Use Plan or other approved plans of the city; or will create hazardous traffic conditions; or will impose an unmitigated burden on public services and facilities, such as fire and police protection; or

(b) Will not promote the purpose and objectives of the planned unit development provisions of this code; or

(c) Does not advance the general welfare of the community and the immediate vicinity and will adversely affect or impact adjoining or surrounding development without satisfactory mitigation measures.

{¶ 13} Similarly, BZC §158.065(I)(9) provides that a PUD zoning classification

shall be approved only if certain requirements are met, including that any otherwise-permitted use "excluded from the specific proposed planned unit development [is] based upon findings in accordance with * * * §158.072(B)[.]"

{¶ 14} Lamar asserts that under BZC §158.159 a digital billboard is a permitted use in the commercial location where it sought to erect its sign. It then argues that neither the Beavercreek city council nor the original or modified PUD excluded digital billboards or made any findings to support excluding them. Therefore, pursuant to BZC §158.072(B)(1), Lamar contends its proposed digital billboard necessarily is permitted.

{¶ 15} Upon review, we find Lamar's reliance on BZC §158.072(B)(1) to be at least arguably misplaced. Another portion of the code, BZC §158.064(I)(1), recognizes that §158.060 through §158.084 were "substantially revised" twice and that the effective dates of these revised provisions governing PUDs are November 12, 1990 and August 26, 2009 respectively. BZC §158.064(I)(2) then states: "All PUD approvals, including any approved modifications, * * * approved by the city prior to the effective date and where any time limitation for such approvals has not expired, shall be governed by the planned unit development provisions and regulations in effect immediately prior to the adoption of Ordinance 90-36, effective 11-12-90 and Ordinance 09-21, effective August 26, 2009."

{¶ 16} Here the original PUD was approved in 1989, which was before the first substantial revision to §158.060 through §158.084. Thereafter, the PUD modification was approved in 1994, which was before the second substantial revision. We note that BZC §158.072(B)(1), upon which Lamar relies, was enacted as part of Ordinance 09-21, the second substantial revision, which took effect August 26, 2009, or approximately 15 years

after the Beavercreek city council's approval of PUD Mod 10-93. Therefore, BZC §158.064(I)(2) appears to dictate that the language of §158.072(B)(1) upon which Lamar relies does not apply to PUD Mod 10-93. Instead, PUD Mod 10-93 would be governed "by the planned-unit development provisions and regulations in effect immediately prior to the enactment of Ordinance 09-21."[2]

{¶ 17} Despite the seeming inapplicability of BZC §158.072(B)(1), we recognize that prior versions of the Beavercreek code contained essentially the same requirements.[3] For example, Ordinance 90-36, which took effect in December 1990,

[2] In its reply brief, Lamar reasons: "[I]f Beavercreek wanted to argue about the version of the Code in effect in 1989 and 1994, it should have submitted evidence in the record while this case was pending before the City Council or under R.C. 2506.03 with the trial court. Beavercreek cannot raise this argument now with no supporting evidence in the record." But governing law is not "evidence." Even if the City of Beavercreek had not filed an appellate brief, we still would be obligated to apply the governing law to Lamar's argument about the applicability of BZC §158.072(B)(1). For that reason, we directed the City of Beavercreek to supplement the record on appeal with (1) a copy of the Beavercreek Zoning Code as it existed when PUD 88-18 was approved in 1989; (2) a copy of the Beavercreek Zoning Code as it existed when PUD Mod 10-93 was approved in 1994; (3) a copy of Ordinance No. 90-36 effective November 12, 1990; and (4) a copy of Ordinance No. 09-21 effective August 26, 2009. The City of Beavercreek complied with our order, and the foregoing materials have been made part of the record before us.

[3] On March 7, 2023, Lamar filed a Motion to Submit a Supplemental Brief to address Beavercreek's supplementation of the record with the former versions of the zoning code and ordinances that we ordered to be filed. In a proposed brief accompanying the motion, Lamar asserts, among other things, that BZC §158.072(B)(1) in fact does apply herein. According to Lamar, BZC §158.064(I)(2) only "means that unexpired PUD approvals still in the approval process are governed by the law in effect when they first were submitted, not by later-enacted provisions." See Lamar's Proposed Supplemental Brief at 4. Lamar argues that PUD Mod 10-93 does not fit into this category. But regardless of whether this assertion is accurate, we agree with Lamar's additional argument that prior versions of the Beavercreek code contain the same requirements as BZC §158.072(B)(1). As we will explain more fully above, former BZC §17.13.2 and current BZC §158.072(B)(1) require the same findings before the city council may exclude an otherwise-permitted use when considering approval of a PUD zoning classification. Our sole purpose in having Beavercreek supplement the record was to determine whether prior versions of the

rewrote Article 17 of the code to govern planned-unit developments. Under §17.05.10 of that ordinance, the rewritten version of Article 17 applies to PUD modifications submitted after its effective date. Like the current version of the zoning code, the Ordinance 90-36 version of Article 17 includes a two-part process for PUD development approval: (1) approval of a PUD zoning classification and (2) approval of a specific site plan.

{¶ 18} Under §17.06.8, if the city council excludes a normally-permitted use from a proposed commercial PUD zoning classification, the exclusion must be supported with findings under former §17.13.2. Much like current BZC §158.072(B)(1), former §17.13.2 provides that a permitted use may be excluded from a commercial PUD when the city council determines that the otherwise-permitted use "is inappropriate for the specific C-PUD development." This determination must be based on at least one of several enumerated findings, namely that the excluded use:

i. Cannot be serviced by adequate public utilities; or presents the potential for significant environmental damage and a satisfactory plan of mitigation has not been provided by the applicant; or is inconsistent with the overall character and other uses of the proposed PUD; or is inappropriate for the

---

zoning code required the findings addressed by current BZC §158.072(B)(1). Having concluded that prior versions of the code are no different in that regard, our resolution of the present appeal does not turn on which version of the zoning code we apply. Our analysis herein would be the same under the former and current versions of the code, as they do not differ in any way that is material to our outcome. That being so, we overrule Lamar's motion to submit additional briefing to address our supplementation of the record with prior law. We also continue to believe that supplementing the record with additional law cannot be erroneous. The law is the law regardless of whether a party cites it, and we are obligated to apply the correct law even if it is not mentioned. Fortunately, the outcome here does not require us to choose between applying former BZC §17.13.2 and current BZC §158.072(B)(1).

topography of the site; or is incompatible with surrounding legal land uses or other approved land uses; or is inconsistent with the City's Land Use Plan or other approved plans of the City; or will create hazardous traffic conditions; or will impose an unmitigated burden on public services and facilities, such as fire and police protection; and

ii Will not promote the purpose and objectives of the Planned Unit Development provisions of this Code; and

iii Does not advance the general welfare of the community and the immediate vicinity and will adversely affect or impact adjoining or surrounding development without satisfactory mitigation measures.

**{¶ 19}** It is readily apparent that former BZC §17.13.2 and current BZC §158.072(B)(1) both require the same findings before the city council may exclude an otherwise-permitted use when considering an application for approval of a PUD zoning classification. We note, however, that under the second part of the PUD development approval process, BZC §17.07.10 does not require specific findings before the city council may impose conditions when approving a proposed PUD site plan. The only necessary "finding" under BZC §17.07.10 is that "the facts submitted with the application and any modifications, amendments, or supplementary conditions satisfy the standards and criteria for specific site plan approval as per Section 17.07.12 of this Zoning Code." In turn, §17.07.12 provides detailed standards and criteria for site-plan approval. They ensure that the site plan promotes the welfare of the community, that its benefits outweigh any detrimental impact, and that it is harmonious with the area.

{¶ 20} In the present case, Lamar correctly notes that the city council did not explicitly exclude digital billboards when approving the landowner's application for a commercial PUD zoning classification or later when approving the PUD modification. Nor did the city council make any "findings" to support excluding digital billboards. But even accepting arguendo that erecting a sign qualifies as an otherwise-permitted use of property, the lack of findings by city council regarding digital billboards is immaterial. The landowner proposed limits on the size, number, and location of signs on the commercial PUD property. And the City of Beavercreek adopted the landowner's limitations in conjunction with approving a site plan and sign plan. We are unpersuaded that mutually-agreed limitations proposed by a landowner and adopted by the city council in conjunction with a site plan and sign plan require the type of "findings" envisioned by BZC §17.13.2 or current BZC §158.072(B)(1). Regardless of whether we apply the former law or current BZC §158.072(B)(1), the lack of "findings" by the city council excluding digital billboards is immaterial, as those findings were not required.

{¶ 21} The next issue we must address is whether the agreed-upon limitations governing signs on the commercial PUD property apply to Lamar's proposed digital billboard. In connection with the city council's initial 1989 approval of PUD 88-18, the landowner filed submissions, plans, and representations. They included, among other things, a site plan and an April 17, 1989 sign plan. This sign plan identified the number, type, size, and location of signs permitted in the development. *See* Lamar's Exhibit 16 at 309, 317-318, 329. The city council's 1994 approval of PUD Mod 10-93 also contained "supplemental conditions." *Id.* at 329. Those conditions included the incorporation of

"submissions, plans, representations, and undertakings presented to the City by the owner in connection with its request for PUD site plan approval." *Id.* at 330. Among the incorporated materials was a sign plan submitted by the owner in support of the request for a modified PUD site-plan approval. One paragraph of the city council's approval conditions stated that "[t]he 'Signage Program and Sign Criteria' submitted by the applicant shall be incorporated as Attachment 'E.' " *Id.* at 333. That document, which is fully identified as the "Signage Program and Sign Criteria for Shopping Center Development," is included in the record. *Id.* at 342. Its introduction states:

> The intent of the signage program is to provide a uniform framework to govern the locations, designs, sizes and heights for all exterior and interior signs of the entire shopping center development.
>
> The purpose of the sign criteria is to provide guidelines so as to allow maximum freedom within the parameters of zoning requirements for designs which are harmonious with the feeling and architecture of the community, as well as with the development of Fairfield Crossing. *The program outlined below encompasses the total signage for the completed project.*

(Emphasis added.) *Id.* at 342.

{¶ 22} The Signage Program and Sign Criteria document proceeds to address the number, location, and specifications for "Free Standing Signs" (which it identifies as "Pylon and Monument Signs" as well as "In" and "Out" signs) and "Exterior Building Signs." *Id.* With regard to free-standing signs, the document authorizes the erection of

two pylon signs and two monument signs at specified locations. *Id.* at 343. Lamar's proposed digital billboard is not authorized under the terms of the document as one of the two pylon or monument signs, which already exist. As noted above, the trial court recognized this fact and observed that "the number and type of signs that may be placed on the 25.8 acres of land governed by Mod 10/93 is specifically and expressly limited by its plain language—'The program outlined below encompasses the total signage for the completed project.' "

{¶ 23} To the extent that the owner's proposed Signage Program and Sign Criteria document contains standards or restrictions that may differ from the general "sign" provisions of the Beavercreek Zoning Code, §17.13.6 of Ordinance 90-36, which was in effect at the time of PUD Mod 10-93, states: "In conjunction with and at the same time as submission of a specific site plan application, applicants may submit a proposed sign limitation and control package specifically fashioned for the PUD development." [4] Moreover, Ordinance 90-33, which also was in effect at the time of PUD Mod 10-93, repealed and replaced Article 20 of the Beavercreek Zoning Code governing signs and outdoor advertising. Notably, §20.04.12 of this new Article 20 provides: "Signs which have been approved as part of a planned unit development sign program may vary from the requirements stated within this article." In light of the foregoing provisions, we conclude that Lamar's application to erect an electronic digital billboard was governed by the terms of the Signage Program and Sign Criteria document submitted by the landowner in conjunction with the city council's approval of PUD Mod 10-93.

---

[4] We note that the same language is found in current BZC §158.072(I).

{¶ 24} In opposition to this conclusion, which is fatal to Lamar's application, Lamar insists that the Signage Program and Sign Criteria document was intended to govern only signage for a shopping-center project within the larger commercial PUD property area. Similarly, Lamar maintains that its proposed sign manifestly is not part of the "total signage for the completed project" referenced in the sign-program document. Lamar asserts that its requested digital-billboard does not relate to the shopping-center project, as it is an "off-premises" sign, meaning that it advertises for goods and services not sold on the property.

{¶ 25} We reject Lamar's argument that its proposed digital billboard was not governed by the Signage Program and Sign Criteria document. The city council's original 1989 PUD approval addresses signs "for identification of the Town Center project," as well as signs "on the project," "in the project," "within the project," and "along the ring road of the project." Significantly, the later PUD Mod 10-93 approval explicitly recognizes that "the project" means the "25.8 acre Planned Unit Development." *See* Lamar's Exhibit 16 at 329. In other words, the modification makes clear that "the project" encompasses all acreage remaining in the commercial PUD area after the modification reduced its size. Lamar's proposed digital billboard would be erected on that remaining acreage. Therefore, it would be part of "the project."

{¶ 26} Like the original PUD, the modification also identifies various permitted signs and details their locations and characteristics. As set forth above, the written Signage Program and Sign Criteria document sets forth the location, design, size, and height of "all exterior and interior signs in the entire shopping center development." Once

again, it unambiguously states that "[t]he program outlined below encompasses the total signage for the completed project."

{¶ 27} In light of the PUD modification's specification that "the project" means the entire 25.8-acre parcel, it is reasonable to infer that the Signage Program and Sign Criteria document, which is incorporated into the approved PUD modification, also means the entire parcel when it references the "total signage for the completed project." In our view, "the project" reasonably means everything occurring on the remaining commercial PUD acreage.

{¶ 28} Having determined that "the project" encompasses the entire 25.8 acres of the modified PUD and that the Signage Program and Sign Criteria document identifies the "total signage" for "the project," the only remaining question is whether Lamar's digital billboard was permitted by the sign-program document. On that issue, the trial court correctly determined that Lamar's proposed digital billboard was not permitted. We acknowledge that the Signage Program and Sign Criteria document does not specifically address digital billboards. Therefore, to the extent that a digital billboard constitutes its own separate category of sign, it is disallowed given that the sign-program document expressly identifies the "total signage" allowed.

{¶ 29} In our view, however, Lamar's proposed digital billboard also qualifies as a "pylon sign," which is addressed in the Signage Program and Sign Criteria document. The current zoning code defines a "pylon sign" as "[a] permanent sign that is mounted on a free-standing pole or other support, and exceeds eight feet in height." BZC §158.003. Similarly, Article 20, §20.01 of the code in effect at the time of PUD Mod 10-93 defined a

pylon sign as "[a] permanent sign that is mounted on a free-standing pole or other support in which the sign exceeds six (6) feet in height."

{¶ 30} Beavercreek's current code defines an electronic "digital billboard" as "[a] sign that directs attention to a business, commodity, services, or entertainment conducted, sold or offered and, other than the supporting structure, is constructed so that the entire face of the sign is an electronic screen, display or device that changes the message or copy of the sign electronically." BZC §158.003. Although the code had no definition for "a digital billboard" at the time of PUD Mod 10-93, we note that Article 20, §20.01 defined an "electronic copy sign" as "[a] permanent sign where different copy changes are shown on the same lamp bank."

{¶ 31} Lamar's proposed sign qualified as a "digital billboard" (or "electronic copy sign" under the former code) and a "pylon sign." *See Neary v Bd. of Zoning Appeals*, 2d Dist. Montgomery No. 17428, 1999 WL 960777, *10 (July 30, 1999) (recognizing that "various definitions pertaining to signs in the zoning code are not mutually exclusive in every instance" and that "it is apparent that some, perhaps even most signs would quite easily fit within two or more of the definitions pertaining to signs"). The digital-billboard definition looks to the nature of a sign's message, whereas the pylon definition focuses on the nature of a sign's construction. As noted above, the Signage Program and Sign Criteria document incorporated into the modified PUD identifies and prescribes the number and location of permitted pylon signs. Given that Lamar's proposed digital billboard qualifies as a pylon sign, it was not allowed under the plain language of the modified PUD.

{¶ 32} Our determination that Lamar's proposed digital billboard is a pylon sign also dispels any possible doubt about whether the sign-program document applies. Under the heading "Free Standing Signs," the document addresses the location of two proposed pylon signs, which later were erected. In so doing, it identifies the boundaries of the area it covers. It provides that "[t]he site is bounded on the north by Interstate 675 and on the west by North Fairfield Road and to the south New Germany-Trebein Road." *See* Lamar's Exhibit 16 at 343. Lamar sought to construct its digital billboard on the corner of Lot 3, which is near the intersection of North Fairfield Road and New Germany-Trebein Road and within the area delineated by the Signage Program and Sign Criteria document. *Id.* at 348, 351-352. Therefore, the restrictions in that document applied to Lamar's proposed digital billboard.

{¶ 33} Lamar also urges us not to take too literally the declaration in the Signage Program and Sign Criteria document that "[t]he program outlined below encompasses the total signage for the completed project." Lamar reasons that if this were true, the document would not explicitly ban "sandwich or easel/portable signs" and "window signs," which it does. Lamar asserts that "[i]f the trial court's interpretation was correct and no other signs were allowed other than what was outlined in the program of Modification 10/93, then its language about sandwich, easel, portable, and window signs would be entirely 'meaningless or inoperative.' "

{¶ 34} In other words, Lamar suggests that the sign-program document would not require explicit exclusions if only specifically identified signs were allowed. Having examined the document, we find Lamar's argument to be unpersuasive. As set forth

above, it provides criteria governing free-standing signs and exterior building signs. In the context of addressing "secondary" exterior building signs, the document simply clarifies that "sandwich," "easel," "portable," and "window" signs are not within the scope of permitted "secondary" exterior signs. In essence, the specifically-excluded signs constitute a subset of "secondary" exterior signs that a person otherwise might presume would be permitted. We do not infer from this clarification that the sign-program document was not really intended to identify "the total signage for the completed project."

{¶ 35} In a final argument, Lamar claims the trial court ignored binding legal precedent holding that zoning restrictions on the use of private property cannot be extended by implication. In support, Lamar cites cases for the proposition that a zoning code explicitly allowing certain signs cannot disallow otherwise-permitted signs through silence or merely by implication. Lamar also cites cases for the proposition that a zoning code specifically disallowing certain signs does not disallow otherwise-permitted signs that are unmentioned.

{¶ 36} In the first case, *Liberty Sav. Bank v. Kettering*, 101 Ohio App.3d 446, 665 N.E.2d 1322 (2d Dist.1995), a city zoning provision prohibited a pole-mounted sign. This court held that the prohibition did not prevent an applicant from erecting a ground-mounted sign, which was defined differently and was not explicitly prohibited. This court recognized the principle that restrictions cannot be extended to include limitations not clearly proscribed. In the present case, however, the limitations contained in the Signage Program and Sign Criteria document were proposed by the landowner and accepted by the city council. More importantly, the sign-program document does not impermissibly

preclude Lamar's proposed digital billboard by silence or implication. The document explicitly allows no more than two pylon signs, and it also explicitly states that its terms encompass "the total signage for the completed project," making clear that no other signs are allowed.

{¶ 37} The next case, *Fettro v. Rombach Ctr., LLC*, 12th Dist. Clinton No. 2012-07-018, 2013-Ohio-2279, addressed whether a sale of real estate to a church would violate the city code or a development agreement containing restrictive covenants. The Twelfth District held that the restrictive covenant precluded the operation of specified businesses but did not prohibit a church. With regard to the city code, the appellate court noted that a church was a permitted use and that the development plan's reference to a "shopping center" on the property "by itself [was] insufficient to prohibit all uses except retail shops." *Id.* at ¶ 26. Here the Signage Program and Sign Criteria document explicitly does prohibit all signs except those identified therein.

{¶ 38} In a third case, *DeSarro v. E. Liverpool Bd. of Zoning Appeals*, 165 Ohio App.3d 732, 2006-Ohio-1290, 848 N.E.2d 544 (7th Dist.), the area at issue was zoned as a "highway or general business" district. The Seventh District held that a drive-through convenience store was permitted there because "drive-throughs can be interpreted to be included under the category of 'highway or general business[.]' " *Id.* at ¶ 39. In reaching this conclusion, the Seventh District relied on the principle that zoning restrictions must be construed in favor of a property owner upon whom they are imposed. *Id.* at ¶ 40-42. In the present case, it is worth noting that the sign-program restrictions on the commercial PUD property were proposed by the landowner and accepted by the city council. In any

event, the issue in the present case is different. In *DeSarro*, the appellate court simply found that a drive-through convenience store reasonably fit within a "highway or general business" district. Here we have examined the Signage Program and Sign Criteria document and have found that Lamar's proposed sign was not permitted. We see little similarity between the two cases.

{¶ 39} The next case Lamar cites is *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161. In that case, a hospital was a permitted use in the zoning district at issue, and the Ohio Supreme Court held that a helipad was a permitted accessory use for the hospital. In reaching its conclusion, the court cited the well-established principles that zoning ordinances are to be construed in favor of property owners, restrictions cannot be extended to include limitations not clearly prescribed, and a zoning provision must be read in the context of the entire ordinance. *Id.* at ¶ 40-42. Perhaps the most notable aspect of the Ohio Supreme Court's ruling was its reliance on Cleveland Ordinance 337.08, which identified a hospital as a permitted use and provided "that no building shall be permitted in a Multi–Family District for any use other than the uses listed therein." *Id.* at ¶ 38. In much the same way, the Signage Program and Sign Criteria document at issue identifies permitted signs and provides that no other signs are allowed "in the completed project."

{¶ 40} The last case cited by Lamar is *Golf Village North, LLC v. City of Powell*, 826 F.Appx. 426 (6th Cir.2020). The issue there was whether a "residential hotel" was a permitted use under a zoning resolution that incorporated a development plan. In a 2-1 ruling, the federal Sixth Circuit Court of Appeals held that the residential hotel was a

permitted use. The majority noted that the development plan enumerated seven prohibited uses but did not mention a residential hotel being prohibited. *Id.* at 436-437. The Sixth Circuit also observed that the development plan lacked "a provision stating that all uses not listed (or reasonably construed to fall within a listed use) are prohibited." *Id.* In the present case, of course, the sign-program document does contain this type of provision, explicitly stating that "[t]he program outlined below encompasses the total signage for the completed project." In our view, this language forecloses Lamar's argument about the denial of its application being an impermissible limitation by implication. In addition, as we explained above, Lamar's proposed digital billboard also is explicitly precluded under the sign-program document because it would constitute an impermissible third pylon sign.

{¶ 41} For all of the reasons set forth above, we conclude that the trial court's decision upholding the denial of Lamar's application to install a digital billboard is supported by a preponderance of reliable, probative, and substantial evidence. Lamar's assignment of error is overruled.

## IV. Conclusion

{¶ 42} The judgment of the Greene County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and LEWIS, J., concur.