JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellant, North Coast Payphones, Inc. ("North Coast"), appeals from a common pleas court ruling that affirmed a decision of the Cleveland Board of Zoning Appeals ("board") declaring 17 payphones owned by North Coast to be nuisances.[1] North Coast argues that the court erred by (1) considering documents that had not been presented to the board, (2) affirming the board's determination, (3) finding that the board did not deprive it of due process, and (4) refusing to find that the board acted with bias. We conclude that the court abused its discretion by concluding that there was reliable, probative, and substantial evidence to support the board's determination that the payphones were nuisances under the city ordinances.
 I {¶ 2} North Coast's appeal from the board's decision is governed by R.C. Chapter 2506. R.C. 2506.04 states that if an appeal is brought under R.C. 2506.01, the court of common pleas must determine if the order or decision of the administrative board or agency is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." The trial court may weigh the evidence and can base a reversal on the evidence only when the record lacks a *Page 4 
preponderance of reliable, probative, and substantial evidence to support the agency's decision. Dudukovich v. Lorain Metro. Hous.Auth. (1979), 58 Ohio St.2d 202, 207.
 {¶ 3} A court of appeals has an even more deferential standard of review:
 {¶ 4} "The standard of review to be applied by the court of appeals in an R.C. 2506.04 appeal is more limited in scope. This statute grants a more limited power to the court of appeals to review the judgment of the common pleas court only on `questions of law,' which does not include the same extensive power to weigh `the preponderance of substantial, reliable and probative evidence,' as is granted to the common pleas court. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The fact that the court of appeals, or this court, might have arrived at a different conclusion than the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." Henley v.Youngstown Bd. of Zoning Appeals, 90 Ohio St.3d 142, 147, 2000-Ohio-493
(internal quotations and citations omitted). Our review of "questions of law" is essentially a question of whether the trial court abused its discretion when determining whether the board's decision is supported by reliable, probative, and substantial evidence. Id. at 148, citingKisil v. Sandusky (1984), 12 Ohio St.3d 30, 34, fn.4. An abuse of discretion connotes more than an error of law or of judgment — *Page 5 
it implies the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 II {¶ 5} On December 27, 2004, the city's commissioner of assessments and licenses notified North Coast that 19 of its outdoor payphones had been declared nuisances by the director of public safety and must be removed within five days of the receipt of notice.
 {¶ 6} North Coast filed an appeal to the board as permitted by Cleveland Codified Ordinance 670B.07(f). The board assigned this appeal Calendar No. 05-2. When the board convened, it deleted from the appeal two of the 19 payphones because North Coast did not own them: 17136 Lorain Avenue and 15208 Lakeshore Boulevard. It then considered documentation showing the number of 911 telephone calls made from each of the respective payphones, including the number of "hang up" calls. It also heard statements from interested persons attending the appeal hearing indicating that many of the payphones were located near retail establishments that sold "alcoholic liquor." The board unanimously voted to deny the appeal and uphold the license revocation.
 III A {¶ 7} The city initiated nuisance proceedings under Cleveland Codified Ordinance 670B.07(a). That section states that upon complaint, the city director of *Page 6 
public safety must investigate "whether the installation and maintenance of the outdoor pay telephone constitutes a public nuisance." The section provides six "conditions" under which an outdoor pay telephone will constitute a nuisance:
 {¶ 8} "(1) The outdoor pay telephone has been used in the commission of illegal drug transactions or other criminal activity, or substantially contributes by its presence to the commission of illegal drug transactions or other criminal activity as evidenced by significant numbers of such crimes occurring in the vicinity of the telephone;
 {¶ 9} "(2) The existence of the outdoor pay telephone has substantially contributed by its presence to the congregation of persons who have made loud noises and other disturbances that have disrupted persons residing near the telephone or disrupted business enterprises located near the telephone;
 {¶ 10} "(3) The existence of the outdoor pay telephone has substantially contributed by its presence to the congregation of persons consuming alcoholic beverages, except where such consumption is expressly authorized by state license, or consuming illegal or controlled substances;
 {¶ 11} "(4) The existence of the outdoor pay telephone has substantially contributed by its presence to the congregation of persons who have interfered with pedestrian or vehicular traffic in the public right-of-way near the telephone;
 {¶ 12} "(5) Usage of the outdoor pay telephone between the hours of 1:00 a.m. and 5:00 a.m. is significantly and repeatedly above normal usage for similarly *Page 7 
situated outdoor pay telephones during the same hours so as to indicate that the telephone is being used in the commission of illegal drug activity or other criminal activity;
 {¶ 13} "(6) The pay telephone has been used to abuse the 911 system."
 {¶ 14} The city's notice of nuisance did not provide a basis for its nuisance determination. At the hearing, the city defended its determination relying entirely on Cleveland Codified Ordinance 670B.05(a)(6) — that the payphones had been used to abuse the 911 system.
 {¶ 15} Chapter 670B does not define what constitutes an "abuse" of the 911 system. We therefore give that term its ordinary meaning. SeeState ex rel. Bowman v. Columbiana Cty. Bd. of Commrs. (1997),77 Ohio St.3d 398, 400. The word "abuse" means to use something wrongfully or improperly. Employing that meaning, we find that the city arbitrarily concluded that it could declare a payphone to be a nuisance based solely on the number of 911 calls made from that payphone, regardless of whether those calls were improper.
 B {¶ 16} To support its argument relating to 911 "hang ups," the city offered into evidence printouts from the Cleveland Police Department which listed certain 911 calls made from each of the subject payphones. These printouts contained a brief, shorthand description of each call. The printouts did not, however, detail every call made from the subject payphone to the 911 operator. The assistant director of *Page 8 
public safety for the city told the board that the printouts omitted any requests for the fire department or emergency medical services ("EMS").
 {¶ 17} Only two of the 17 payphones were addressed in detail. The first payphone addressed at the hearing was located at 12520 Lorain Avenue. The police printout listed 23 calls to 911 from that payphone in an 11-month period. Eleven of those calls were related to alarms going off. Seven of the calls were "hang-ups." One call related to passing bad checks; one call reported a robbery at a convenience store; one call was listed as "ASST FE CALLED FROM PAY TELE SPOKE NO;" one call asked for assistance in locating the caller's 14 year-old son; and one call was listed as "911 HANG UP/ HUNG UP AGAIN ON CALL BACK."
 {¶ 18} The second payphone addressed at the hearing was located at 14053 Lorain Avenue. The police printout listed 21 calls to 911 from this payphone in an eight-month period. Fifteen of the calls were alarms. One caller reported holding a male shoplifter and requesting a zone car; one call reported a drunk driver; one caller reported an unknown male "casing" the caller's premises; one call was listed as "criminal simulation/ns"; one call reported a "large number of juveniles in the parking lot;" and one call reported a male threatening with a gun.[2] *Page 9 
 IV A {¶ 19} Even though the city gave the board a list of 911 calls made from each of the subject payphones, it made no effort to differentiate legitimate 911 calls from calls that abused the system. In fact, the city did not offer a complete documentation of all 911 calls made from each payphone because it admitted that its list did not include 911 calls that sought fire or EMS assistance. While the city's list of calls contained a number of "hang up" calls that could conceivably be considered to have abused the 911 system, the city's failure to provide a complete accounting of all 911 calls made from each of the subject payphones made it impossible for the board to determine the percentage of calls that abused the system.
 {¶ 20} As North Coast argued to the board, the city's position meant that a single 911 "hang up" call could be enough to have a payphone declared a nuisance. Replying to this argument, the city's assistant director of public safety told the board:
 {¶ 21} "* * * [T]he City's position is not that a legitimate 911 call is never made from a telephone or any of these telephones. That may happen. You know, when they're dominantly issues like these, we're looking at certain types of calls, when we see a lot of drugs, prostitution, juveniles, fights, and all those other things, that it sits *Page 10 
out way in our minds for one legitimate call or a few legitimate calls that might be made. So, again, what I was saying, this particular phone appeared to have some 911 abuse, 911 hang-ups. You know, that doesn't mean we don't have dispatchers or call-takers paying attention to that call. That doesn't mean we don't send officers to check on that location, you know, based on the priority of calls that they're handling when they're out on the street. That was one of the points I wanted to raise."
 {¶ 22} We find as a matter of law that the city's evidence failed to show that the payphones in question were used to abuse the 911 system. At the outset, we reject any assertion that a single, wrongful 911 call could be sufficient to have a payphone declared a nuisance. Although the city's position on this point is unclear, we find as a matter of law that it would take an overly-broad interpretation of the Cleveland Codified Ordinance 670B.05(a)(6) to reach that conclusion. The word "abuse" connotes more than just a mere error in calling 911 — that there must be a conscious decision to use the payphone to misuse the 911 service. Read in context with the rest of section 670B.05(a), we find that subsection (a)(6) requires more than just an occasional use of the payphone to misuse the 911 system. Viewed under the totality of the circumstances, we believe that a payphone is used to abuse the 911 system when the cost of abusive calls outweighs the benefit provided by payphone access to emergency services. If we were to construe the ordinance in the absolute terms suggested by the city, it would allow the city to declare a payphone a nuisance *Page 11 
as a result of a single 911 hang up, no matter what reason prompted the hang up. That would be an absurd proposition, and we are obligated to construe statutes to avoid absurdity. See R.C. 1.47(C); State ex rel.Webb v. Bliss, 99 Ohio St.3d 166, 2003-Ohio-3049, at ¶ 22.
 {¶ 23} Read in this manner, the evidence provided by the city did not show that the payphones had been used to abuse the 911 system in a manner consistent with the purposes of the ordinance. While 911 hang up calls were undeniably made from the two payphones in question, the city's own evidence showed that a far greater number of legitimate 911 calls had been made from those same payphones. Moreover, this list of legitimate calls did not include 911 calls to the fire department or EMS. The city's evidence did not establish that the payphones were used to abuse the 911 system such that they constituted a nuisance as defined by subsection (a)(6).
 B {¶ 24} The city also appeared to argue that the payphones constituted a nuisance under section 670B(a)(1) because they had substantially contributed by their presence to the commission of illegal activity. At one point in the hearing, the assistant safety director noted that the payphones used to make the 911 calls had been located in areas where there were incidents of "drugs, prostitution, juveniles, fights, and all those other things." The board also heard from a councilman for the ward in which one of the subject payphones was located, who objected to its *Page 12 
presence because it negatively affected "the peace and good order of the neighborhood and, indeed, it is believed that these phones will promote illicit drug trade and crime." North Coast challenged the city's characterization of the 911 calls, noting that for one specific payphone, 11 of the 23 calls had been for alarms, and that none of the calls related to gang-related activity, persons congregating, prostitution or drug activity.
 {¶ 25} The city offered no evidence to show that any of the subject payphones had substantially contributed by their presence to crime. Instead, it maintained that the number of 911 calls from each payphone showed that they were located in high crime areas and hence must have contributed to the crime. This is a variant of the post hoc fallacy which is based upon the mistaken notion that simply because one thing happens after another, the first event was a cause of the second event. A sequential pattern of conduct does not mean that two events are causally related. The city theorized that because crime occurs and a payphone is used to report the crime, the payphone must be related to the crime. The conclusion does not follow from the prior event.
 {¶ 26} Moreover, the city's argument is counterintuitive. It suggests that the use of a payphone to report a crime is the same thing as contributing to the underlying crime that had just been reported. When a 911 call made from a payphone reports a crime, it is difficult to understand how the payphone could be considered to have contributed to the crime. Presumably, the crime had been *Page 13 
committed by the time the payphone was used to make the emergency call. Employing the city's logic, it would be forced to conclude that 911 calls for fire department assistance meant that the payphones caused or contributed to the fires. The absurdity of this argument is self-evident.
 {¶ 27} Our review of the individual 911 calls made from each payphone shows that the vast majority of the 911 calls appeared to constitute a legitimate use of the 911 service to seek assistance or report alarms. Even the city's assistant safety director admitted that she did not know "whether or not those alarms are actually connected" with the payphones. Although she had no evidence to support her conclusion, she said the city chose to view the 911 calls as contributing to the crime.
 {¶ 28} The arbitrary manner in which the city invoked Cleveland Ordinance 670B.07(A)(1) can be demonstrated by an extension of the city's rationale for declaring the payphones to be a nuisance. The use of the phrase "substantially contributes by its presence" necessarily requires a nexus between the presence of the payphone and criminal activity. The city failed at all events to show this nexus. Instead, it relied solely on the number of 911 calls to substantiate its claim that the payphones were in high crime areas. This argument does not show any connection between crime in a neighborhood and the placement of a payphone.
 {¶ 29} The city now appears to argue that it was justified in revoking the permits because the large number of 911 calls "affect the quality of life in the *Page 14 
community." See Appellee's Brief at 10. The city's ordinance does not contain any "quality of life" criteria as a basis for declaring a payphone a nuisance. In any event, the city's argument incorrectly equates a call for 911 emergency response with causation — that somehow the 911 calls themselves are causing the problems in the community, as opposed to the actual criminal acts that are being reported. Given the city's own evidence that the payphones had been used to report crime, removing the payphones would simply limit the ability to report crimes. The crime rate would not be consequently lower; it would merely be underreported.
 {¶ 30} We therefore conclude that the court abused its discretion by affirming the board's decision to uphold the permit revocations as being supported by reliable, probative, and substantial evidence. The city failed as a matter of law to show that payphones had been used to abuse the 911 system and that they substantially contributed by their presence to an increase in criminal activity in the vicinity of the payphones. We remand to the court with orders to reinstate the payphone permits. Our conclusion that the permits should be reinstated necessarily moots our need to address any alleged procedural irregularities in the proceedings before the board. See App.R. 12(A)(1)(c).
 {¶ 31} This cause is reversed and remanded for proceedings consistent with this opinion.
It is, therefore, ordered that said appellants recover of said appellee their costs herein taxed. *Page 15 
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, JUDGE
FRANK D. CELEBREZZE, JR., J., CONCURS
COLLEEN CONWAY COONEY, P.J., CONCURS IN JUDGMENT ONLY
[1] This is one of four different appeals involving North Coast Payphones and the city of Cleveland. See North Coast Payphones, Inc. v.City of Cleveland, Cuyahoga App. No. 88090, 2007-Ohio-6814; North CoastPayphones, Inc. v. City of Cleveland, Cuyahoga App. No. 88190,2007-Ohio-6991; North Coast Payphones, Inc. v. City of Cleveland, Cuyahoga App. No. 88324, 2007-Ohio-6981.
[2] As the hearing progressed, North Coast's counsel told the board that "[w]e're just going to go through the same things. Frankly, there's no sense of going through any of these because I'm not going to point out how many of these are not phone related. Almost every one of these are not phone related. * * * There's no sense of wasting anybody's time." From that point forward, the board simply noted the number of 911 calls made from each phone without referencing the nature of each call. *Page 1