[Cite as *Wiebusch v. Cleveland Civ. Serv. Comm.*, 2012-Ohio-3953.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97714**

## N. KURT WIEBUSCH

PLAINTIFF-APPELLANT

vs.

## CITY OF CLEVELAND, CIVIL SERVICE COMMISSION

DEFENDANT-APPELLEE

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-750808

**BEFORE:** Celebrezze, P.J., Rocco, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 30, 2012

**ATTORNEYS FOR APPELLANT**

Walter F. Ehrnfelt
Luke F. McConville
Waldheger-Coyne, L.P.A.
1991 Crocker Road
Suite 550
Westlake, Ohio   44145


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Interim Director of Law
James C. Cochran
Assistant Director of Law
City of Cleveland
Department of Law
601 Lakeside Avenue
Room 106
Cleveland, Ohio   44114-1077


**ALSO LISTED:**

N. Kurt Wiebusch
5200 Norbeck Road
Rockville, Maryland   20853

FRANK D. CELEBREZZE, JR., P.J.:

**{¶1}** Appellant, former Commissioner of the Division of Architecture for the city of Cleveland, N. Kurt Wiebusch, brings this appeal challenging the common pleas court's affirmance of the decision of the Cleveland Civil Service Commission upholding his termination. He argues that the city of Cleveland (the "City") did not have just cause to terminate his employment and that the common pleas court erred in upholding his termination. After a thorough review of the administrative record and law, we affirm the common pleas court's decision.

## I. Factual and Procedural History

**{¶2}** Wiebusch was hired by the City on February 20, 2000. At that time, his license to practice as an architect with the state of Ohio had lapsed due to failure to renew and pay the fees. Wiebusch began his employment with the City as "Manager of Architecture." On March 6, 2001, Wiebusch was appointed Commissioner of Architecture for the City. The job description for Commissioner of Architecture, which Wiebusch helped to amend in 2001, stated,

> [t]he Commissioner of Architecture shall design and prepare or cause to be designed and prepared drawings, plans, estimates, and architectural specifications for all buildings under the charge of the Department of Public Services, and render similar services to the Mayor and to the other departments of the City upon request from the director of the department desiring the same and bearing the written approval of the Director of Public Services.

{¶3} Wiebusch served in this position satisfactorily under a number of mayoral administrations. However, beginning in 2008, there were problems with several projects that Wiebusch was involved in, and his superiors began receiving various complaints about his performance and demeanor. As a result of these issues, he was suspended for nine days in late 2009. Following this suspension, the City discovered that Wiebusch was not a licensed architect in the state of Ohio from 1997 to 2006. On September 14, 2009, his direct supervisor, Jomarie Wasik, sent Wiebusch a termination later documenting the grounds for his termination.

{¶4} Wiebusch sought review of that decision with the Cleveland Civil Service Commission. On April 16, 2010, a hearing began before Referee Thomas Skulina. Four days of testimony resulted, and the parties briefed their respective positions. Referee Skulina issued a lengthy opinion upholding the termination. He organized the allegations justifying termination into four categories: Projects that were improperly handled, resulting in delays ("Morgana" and "Cory Recreation"); projects where Wiebusch insisted on procedures that were not within the purview of his authority that resulted in delays and disregard of a superior's orders ("Public Hall renovation" for the Rock Hall induction ceremony); projects that were delayed due to Wiebusch's failure to adequately or timely communicate with his superiors ("Division of Fire Assessments," "Coast Guard Station Roof"); and projects where Wiebusch certified documents as an architect when he was not a duly licensed architect.

{¶5} The Morgana project called for the conversion of a Cleveland park into a larger athletic facility to be used by nearby Cleveland Central Catholic High School ("CCCHS") and the public. The facility would accommodate soccer, football, baseball, softball, and track and field events. The facility was to be used by CCCHS as their home field. The project consisted of three phases. During phase one, the athletic field and track were to be installed. This project was managed for the City by Wiebusch, and construction began in September 2008. After significant delays, Wiebusch was removed from the project in April 2009 at the direction of Chief of Staff Kenneth Silliman. Phase one was completed one year after all three phases were to have been completed.

{¶6} Wiebusch was removed in part because he stopped the project for two weeks and failed to inform any of his supervisors or others working on the project (specifically Chief Silliman or Chief Operating Officer Darnell Brown). Wiebusch claimed his actions were justified based on misrepresentations made by the contractor responsible for site preparation. Both Wiebusch and Dr. Farrokh Screwvala, the geotechnical engineer on the project recommended by Wiebusch, testified that EnviroCom Construction, Inc. ("EnviroCom"), had lied about fully excavating and removing several basement foundations of demolished houses that would negatively impact the performance and longevity of the field.

{¶7} The Cory Recreation Center project sought to remedy groundwater infiltration into a building leased by the City and used as a community recreation center. Water was pooling in several areas including the lobby and basement. Dr. Screwvala

recommended that two exterior wells be drilled and sump pumps installed to carry ground water away from beneath the structure.   Dr. Screwvala also insisted on a liability release, which Wiebusch supported based on the Division of Parks and Recreation's past track record with maintaining pumps.   If the pumps were not properly monitored, sand supporting the structure could be pumped out from beneath it and the foundation could fail. However, Paul Burick, project architect for the Cory Recreation project, testified that during a rain event, he observed that down spouts that channeled water through the building and out were leaking.   He oversaw the installation of drains to the existing down spouts that routed the water into the catch basin in the parking lot rather than through the building, and this solved the water issues in the lobby.   Burik testified that the problems at the site had been solved, and he was unaware of any further complaints after remodeling was completed.   The dispute about a waiver of liability with the parks department delayed the project for approximately six months.   Wiebusch insisted that this solution did not address the water infiltration issues in the basement of the Cory Recreation Center.

{¶8} Referee Skulina characterized Wiebusch's relationship with Dr. Screwvala as one of unfailing loyalty, even when Screwvala's proposals were overly expensive, complicated, and time consuming.   Wiebusch's failure to resolve disputes such as these during projects resulted in delays until he was ultimately removed from several projects.

{¶9} The City also provided examples of insubordination justifying termination. The Rock and Roll Hall of Fame induction ceremony was scheduled to be held in

Cleveland for the first time, but renovations to Public Hall were needed to accommodate the event. Wiebusch's department was tasked with developing contract specifications for repairs to the roof of Public Hall, refurbishing theater seating, and renovation of the restroom facilities. To accommodate the rapid construction schedule, all parties agreed that change orders, normally addressed at the time they were made, would be reconciled at the end of the project.

{¶10} Wiebusch made written objections to the policy and the change orders even after it was made clear that he had no authority and was not involved in the process. Wiebusch refused to step aside even after being ordered to do so by his superiors. He held the view that provisions of the city charter, city ordinances, and the Ohio Revised Code were being violated by having others serve as contract administrators. The City's law department investigated the issue and concluded that he was incorrect. Referee Skulina found that Wiebusch's refusal to cease participation in the project was insubordinate and grounds for termination.

{¶11} As an example of poor work performance, the City pointed to the way Wiebusch handled a large project that had been assigned to his division. Two million dollars had been allocated to renovate Cleveland fire houses in 2007. The Division of Architecture was tasked with compiling a report detailing the current state and estimated costs of renovation for each fire house. Wiebusch estimated the project would take one year and set a deadline for the summer of 2008 to complete the assessment.

{¶12} In another part of the project managed by the Division of Architecture, Requests for Proposals ("RFP") were sent out to various consulting and contracting entities by the spring of 2008. The Architect's office was to obtain bids for consulting services for these projects and evaluate them, passing on recommendations to the officials in charge of authorizing contracts. By September 2008, bids were received and ready for evaluation and recommendation by Wiebusch's department. The recommendations were to be presented to the City Council for a vote. The proposals had still not been evaluated by Wiebusch by the spring of 2009. Chief Silliman testified that this was unacceptable. He felt this situation embarrassed the City with the companies that expended time and money putting together bid packages and the fire personnel staffing the fire houses.

{¶13} Wiebusch had initially set a date for completion of the assessment report at the end of summer 2008. A facilities assessment report was to be generated and submitted to Chief Brown. When that report did not come, Wiebusch extended its completion date to fall 2008. Chief Brown testified that as deadlines approached and passed, he expected to hear from Wiebusch regarding the report, but Wiebusch failed to adequately communicate that the report would not be completed on time. A report was submitted tardy to Chief Brown, but, according to him, it failed to include necessary information such as estimated costs. Ultimately, Chief Brown had his own staff complete the report, including a summary for each fire house that was necessary, in his opinion, to make the voluminous document useable.

{¶14} After Wiebusch missed the mid-October deadline for the evaluation report, his superior ordered him to halt all other work in the department until the project was complete. He ignored this order and failed to timely complete this project. The Department of Architecture was ultimately removed from the project, and it was completed by the Department of Parks, Recreation, and Properties and the Division of Research, Planning, and Development.

{¶15} Wiebusch insisted that he had requested a mechanism be put in place to prioritize the increasing number of projects coming into his division, but his requests were ignored for several months. When such a prioritization did occur, the RFP's were classified as a secondary priority on a list of approximately 20 projects that included three levels of prioritization.

{¶16} The City also offered another example of Wiebusch's poor communication and job performance. In the spring of 2009, Chief Silliman asked Wiebusch to evaluate the cost to repair the roof of the boathouse of the Cleveland Coast Guard Station and whether those repairs would be under $50,000. The question was precipitated by a request for use of the building as the site of the annual Burning River Festival scheduled to be held August 15, 2009. Work done at the Department of Architecture in 2006 had estimated the roof repair at approximately $300,000. Rather than answering this question in a timely manner, Wiebusch waited for an entire new bid package to come in May 2009. Wiebusch testified that he had his assistant, Kenneth Skidd, inform Director

Wasik of the estimated cost of repair soon after the question was posed to Wiebusch, but never personally informed Silliman or ensured that the information reached Silliman.

{¶17} Finally, when Wiebusch applied to and was hired by the City, his license to practice architecture in the state of Ohio had lapsed due to failure to pay licensing fees. He explained that his former employer was supposed to pay those fees, and he was unaware at the time that he was no longer a licensed architect. He also explained that the City had agreed to pay his licensing fees and, for whatever reason, they failed to do so. He discovered this in 2005 after he sought to become licensed in the state of North Carolina, and a national organization of architectural review boards failed to find records of his registration in Ohio. He had intended to move to North Carolina and had even submitted a letter of resignation to his supervisor at the City. He later rescinded that letter, but did not inform his supervisor of his license issues during that conversation. He negotiated a settlement with the Ohio Architecture Board that allowed him to reapply for registration after paying a $1,000 fine and completing some ethics training. Wiebusch never informed his supervisors of this issue, although he did inform an attorney in the City's law department and an employee in the City's building department. The City found three instances where Wiebusch had affixed his architecture seal to plans or drawings certifying them when he had no authority to do so without a valid license.

{¶18} Based on the failings detailed above, the referee concluded the City had sufficient justification to terminate Wiebusch for cause. Specifically, for violating Civil Service Rules 9.10.03 ("[i]ncompetence or inefficiency in performance of duties"),

9.10.04 ("[f]raudulent conduct or false statements in any application or examination for a position in the Civil Service of the City"), 9.10.05 ("[c]onduct unbecoming an employee in the public service"), 9.10.08 (insubordination), 9.10.09 ("[o]ffensive conduct or language toward fellow employees, superiors or the public in the course of his/her employment"), and 9.10.18 ("[f]or other failure of good behavior which is detrimental to the service, or for any other act of misfeasance, malfeasance, or nonfeasance in office").

{¶19} Wiebusch then appealed that determination to a full panel of the Cleveland Civil Service Commission. A good deal of the referee's opinion was devoted to Wiebusch's lack of a valid architect's license for the majority of his tenure with the City. The panel found that the termination letter did not accurately provide grounds for termination based on the lack of a professional license, but concluded that other grounds existed in the record supporting termination. The termination letter indicated that Wiebusch had made misrepresentations on his application indicating he was a licensed architect. The application asked for highest level of education, to which Wiebusch indicated "professional registration." This is something he had achieved, and not technically a misrepresentation. However, the panel found that the other instances of insubordination and inadequacy in job performance justified termination.

{¶20} Wiebusch then appealed that determination to the Cuyahoga County Common Pleas Court. That court found that the Cleveland Civil Service Commission's decision upholding the termination was supported by reliable, probative, and substantial evidence and was not unconstitutional or contrary to law. The court found that while

each individual allegation may not support termination, when taken as a whole, they provided sufficient justification for the City's decision to terminate Wiebusch for cause. That decision was appealed to this court.

## II. Law and Analysis

{¶21} Wiebusch assigns one error for our review, claiming "[t]he trial court erred in determining there was just cause for terminating * * * [his employment], thereby upholding the decision of the Civil Service Commission."

## A. Standard of Review

{¶22} The common pleas court's jurisdiction to hear the present dispute flows from R.C. 2506.01, which permits an appeal to the court of common pleas from a final decision of a political subdivision regarding the termination of its civil service employees. R.C. 124.34(A) further provides,

> [t]he tenure of every officer or employee in the classified service of the state and the counties * * * shall be during good behavior and efficient service. No officer or employee shall be * * * removed * * * except * * * for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of any policy or work rule of the officer's or employee's appointing authority, violation of this chapter or the rules of the director of administrative services or the commission, any other failure of good behavior, any other acts of misfeasance, malfeasance, or nonfeasance in office, or conviction of a felony.

{¶23} R.C. 124.34 then allows for review of any decision of a civil service commission regarding termination, among others, according to the procedure set forth in R.C. 119.12. This statute sets forth the standard of review to be applied by the court reviewing the agency's determination:

The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law.[1]

**{¶24}** "An appellate court's review is more limited than that of the common pleas court. *Klaiman* [*v. Ohio State Univ.*, 10th Dist. No. 03AP-683, 2004-Ohio-1137,] ¶ 8. Unlike the common pleas court, an appellate court does not weigh the evidence. *Id.*" *Mayer v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-380, 2012-Ohio-948, ¶ 13. This court's review is limited to examining whether the trial court abused its discretion when determining whether the agency's decision is supported by reliable, probative, and substantial evidence. *Lane v. E. Cleveland Civ. Serv. Comm.*, 8th Dist No. 93530, 2010-Ohio-2352, ¶ 23, citing *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 2000-Ohio-493, 735 N.E.2d 433. To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

### B. Instances of Violations of Civil Service Rules

**{¶25}** R.C. 124.34 provides that civil service employees may only be terminated for an enumerated list of reasons. In support of its decision to terminate Wiebusch, the City lists several instances where it alleges civil service rules were violated.

**{¶26}** The renovations of Public Hall in anticipation of the Rock Hall induction ceremony provides the strongest evidence of violations of civil service rules justifying

---

[1] R.C. 2506.04 also provides a common pleas court with the applicable standard of review when reviewing a final decision of an administrative agency.

termination. The written correspondence in the record demonstrates a clear directive from Wiebusch's superiors to remove himself from the project. After this directive, Wiebusch continued to send correspondence to contractors; the Director of Parks, Recreation, and Properties, Michael Cox; and the person in charge of the project and contract administrator, Donald Kasych. The emails and memos in the record demonstrate the confusion caused by these actions as well as the blatant disregard of any chain of command.

{¶27} While Wiebusch appears to have had the interests of the City in mind, his handling of the situation provides grounds for termination. The evidence in the record shows a violation of Cleveland Civil Service Rules 9.10.8 (insubordination) and 9.10.05 (conduct unbecoming an employee in the public service).

{¶28} During the Morgana project, Dr. Screwvala, the geotechnical engineer consulting on the project, recommended deep dynamic compaction to prepare the site for installation of the track and field. This process was more expensive than other options, but was ultimately chosen at Dr. Screwvala's recommendation. Extensive preparation of the site was necessary as well as removing any debris left from several homes that had been demolished by the City. Dr. Screwvala and Wiebusch both testified that EnviroCom, the contractor responsible for this work, tried to simply cover over the basements of demolished homes rather than excavate them according to the contract specifications. Both claim to have uncovered evidence of this fact. This led to a deterioration of the relationship between EnviroCom and Dr. Screwvala. The two

eventually could no longer work together, and correspondence in the record sent by Dr. Screwvala demonstrated an unprofessional attitude.

{¶29} This came to a head after an impasse on how to demonstrate that the basements were fully excavated. When EnviroCom inquired where the extra fill material necessary to complete the dynamic compaction process would come from, Wiebusch indicated EnviroCom was responsible for it. The contract documents specified EnviroCom would supply up to 3,000 cubic yards of a specific fill material, but the dynamic compaction contractor indicated it would take as much as 11,500 cubic yards. By this time, the project had been shut down twice following allegations that EnviroCom failed to properly excavate the basement structures left on the site. Chief Silliman intervened and had discussions with the primary contractor overseeing the project, William Behnke. Behnke ultimately recommended the removal of Dr. Screwvala from the project. The new geotechnical engineer recommended foregoing dynamic compaction in favor of a less costly and time-consuming process.

{¶30} Similarly, the Cory Recreation Center project provides an example of delays cropping up in projects managed by Wiebusch. The insistence on a waiver of liability for Dr. Screwvala or an acknowledgment of liability from Director Cox created a delay of some six months. Ultimately, evidence in the record shows that pumps and the reason for the waiver, pump monitoring, were not required. While Dr. Screwvala and Wiebusch dispute that the solution implemented in the project solved the problems encountered at the Cory Recreation Center, the testimony of another architect in the Division of

Architecture indicates no further problems were reported at the recreation center after a less costly solution was implemented.

**{¶31}** The fire house assessment and request for proposals also demonstrates deficient job performance justifying termination. During this project, a cost assessment for renovating fire houses needed to be completed before proposals could adequately be evaluated. Wiebusch requested one year to complete the assessment portion of the project. That deadline passed without Wiebusch providing notice to his superiors. He insists the delays in completing the assessment resulted from the workload piled on his division and lack of leadership from the mayoral administration as to which projects should be given priority. However, Wiebusch set the completion date and did not inform anyone that the project would take longer until after the deadline had passed. As a result, the requests for proposals went out, but could not be acted upon. They languished and became stale. This demonstrates violations of Cleveland Civil Service Rule 9.10.1 (neglect of duty) and 9.10.3 (inefficiency in performance of duty).

**{¶32}** When Fire House 41 was renovated in 2007, evidence in the record suggests that Wiebusch ignored requests from the fire personnel there to address heating issues in a newly constructed office within the barracks section of the fire house.

**{¶33}** Within the sleeping quarters of Fire House 41, an office was constructed. The specifications did not call for a separate source of heat within the office because it was contained within the sleeping quarters. However, after completion of the renovations, it came to Chief Brown's attention through a union workplace grievance

filed by the director of public safety that there was inadequate heating in the office. Chief Brown testified that calls placed by fire personnel to the division of architecture before the workplace grievance was filed were ignored. Ultimately, the department of public safety caused electric baseboard heat to be installed without the aid of the division of architecture.

{¶34} Wiebusch testified that the provision of heat was not called for in the specifications for the renovation because it was believed that heat from the surrounding sleeping quarters would be adequate. He testified that he never received complaints of inadequate heating in the office.

{¶35} The Coast Guard boathouse project provides the weakest example of conduct justifying termination. Prompted by an inquiry from the organizers of the Burning River Festival, Chief Silliman had asked if renovations to the roof could be done for under $50,000 and in time for the upcoming event. Wiebusch tasked a person in his office with responding within a few days that it probably could not be done for that amount. Chief Silliman testified that he heard back within a few days that it probably could not be done for that amount, but he said he heard nothing definite from the division of architecture until almost two months later, even though a cost assessment had been done by the division that indicated that the cost to renovate the boat house roof and another building roof was approximately $300,000.

III.  Conclusion

**{¶36}** There are clear instances of insubordination found in the written correspondence contained in the record, especially regarding the Public Hall renovation project. While Wiebusch may have been fulfilling his duties under the city charter and Ohio Revised Code as he saw them, others disagreed with his interpretation, and ultimately his decision to actively ignore his superior's directives was grounds for termination. The other examples support termination when taken as a whole, as the common pleas court determined. This court's review of the common pleas court's decision is limited to examining the record and determining whether its decision is supported by reliable, probative, and substantial evidence. Based on the record before this court, the common pleas court's decision upholding the decision of the Cleveland Civil Service Commission is supported by a preponderance of substantial, reliable, and probative evidence. Accordingly, the trial court did not abuse its discretion.

**{¶37}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

KENNETH A. ROCCO, J., and
EILEEN A. GALLAGHER, J., CONCUR