[Cite as *Evil Empire, L.L.C. v. Troy Bd. of Zoning Appeals*, 2023-Ohio-960.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| EVIL EMPIRE, LLC, ET AL. | : | |
| Appellees | : | C.A. No. 2022-CA-25 |
| v. | : | Trial Court Case No. 21 CV 378 |
| CITY OF TROY BD. OF ZONING APPEALS, ET AL. | : | (Civil Appeal from Common Pleas Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 24, 2023

. . . . . . . . . . .

JEREMY M. TOMB and KELLY M. SCHROEDER, Attorneys for Appellees

DAVID C. GREER, DEREK L. MUNCY and J. STEVEN JUSTICE, Attorneys for Appellant, 116 West Main, LLC

SCOTT A. LIBERMAN and STEVEN E. BACON, Attorneys for Appellants, City of Troy Bd. of Zoning Appeals, et al.

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} 116 West Main, LLC ("West Main") appeals from the trial court's judgment entry reversing the City of Troy Board of Zoning Appeals' approval of its application to

demolish a structure known as the Tavern building.

{¶ 2} West Main contends the trial court erroneously found that the Troy Planning Commission and Board of Zoning Appeals lacked authority to modify deficient "reuse" and "rescue" plans supporting West Main's application.

{¶ 3} For the reasons set forth below, we find no error in the trial court's resolution of the foregoing issue. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 4} West Main owns the Tavern building, which was built in the mid-1800s. The building is located in Troy's downtown historic district. West Main purchased the property in 2018 with the intention of preserving and marketing it for lease. The Tavern building subsequently sustained tornado damage in 2020. Post-storm inspections revealed additional issues related to rotting in the roof and other concerns regarding structural integrity. In September 2020, West Main applied for a certificate of appropriateness to demolish the structure. It then withdrew its application and explored a potential sale. After no sale materialized, West Main submitted another application to demolish the Tavern building in September 2021.

{¶ 5} Following a hearing, the Planning Commission approved West Main's application by a 4-3 vote. The approval included conditions related to seeding the lot in anticipation of improvements by a future owner, salvaging historical items, and ensuring the integrity of walls shared with adjacent property owners. Two adjacent property owners, Evil Empire, LLC and Cheryl Cheadle, were joined by the Troy Historic Preservation Alliance and one of its members, Ben Sutherly, in appealing the Planning

Commission's decision to the Troy Board of Zoning Appeals ("BZA"). Following its own hearing, the BZA determined that Sutherly lacked standing in his individual capacity based on his status as a member of the Troy Historic Preservation Alliance. The BZA then conducted a de novo review and approved West Main's application with "modifications" to address deficiencies regarding "rescue" and "reuse" plans.

{¶ 6} For present purposes, the most significant deficiency found by the BZA concerned West Main's proposed reuse plan for the property, which simply involved seeding the lot in anticipation of unspecified future development. The BZA held that this plan "failed to sufficiently and fully mitigate the adverse effect of the proposed removal upon the property, the street scape, and the historic district as required by [Troy Zoning Code] Section 1143.22(f)(10)(B)(2)." The BZA also held that West Main's proposed reuse plan "did not provide definite plans for reuse of the site as required by Section 1143.22(f)(10)(B)(3)."

{¶ 7} After noting the foregoing deficiencies, the BZA found "in accordance with its authority under Section 1143.22(f)(23)(B), that the Application shall be approved, but that it shall be approved subject to additional modification to address the requirements of Sections 1143.22(f)(10)(B)(2) and (3)." The BZA then imposed several "modifications" to West Main's application for a certificate of appropriateness to demolish the Tavern building, including the following:

1. The Applicant shall submit to the City of Troy an application for a Certificate of Appropriateness for the new construction of a replacement structure within ninety (90) days of the date of this Decision. This new

application shall also address the considerations for a definite plan of reuse [sic] of Section 1143.22(f)(10)(B)(2)(I) through Section 1143.22(f)(10)(B)(2)(V). Additionally, because the new construction would follow the application to demolish an entire structure, the new application shall address the considerations of Section 1143.22(f)(10)(B)(3); [and]

2. The reuse plan shall also include the salvage, if feasible, of any architectural materials that document the historical nature of the building, including, but not limited to, historical plaques located on the interior or exterior of the building.

{¶ 8} Evil Empire, Cheadle, Sutherly, and the Troy Historic Preservation Alliance filed an administrative appeal to the trial court from the BZA's November 18, 2021 decision approving West Main's application for a certificate of appropriateness to demolish the Tavern Building.

{¶ 9} The trial court upheld the BZA's determination that Sutherly lacked individual standing, noting that the appellants' joint merit brief did not address the issue. The trial court then found that the BZA's decision approving West Main's application for a certificate of appropriateness was arbitrary, unreasonable, and unsupported by a preponderance of substantial, reliable, and probative evidence. The trial court agreed with the BZA that West Main had satisfied some of the requirements for obtaining a certificate of appropriateness. The trial court nevertheless found that West Main was not excused from submitting a proper "rescue plan" regarding the property, which had not been done. The trial court also found that West Main had not met its obligation to submit a "definite

reuse plan." The trial court reasoned that the BZA could not rely on its "modification" authority to excuse West Main's failure to satisfy these explicit prerequisites to obtaining a certificate of appropriateness. The trial court held that the BZA should have denied West Main's application rather than approving it with a condition (i.e., a "modification") essentially directing West Main to satisfy unmet requirements in the future. Finally, the trial court also found that necessary evidence about West Main's experiencing a "substantial economic hardship" was lacking. For each of the foregoing reasons, the trial court reversed the BZA's decision approving West Main's application for a certificate of appropriateness to demolish the Tavern building. This appeal by West Main followed.

## II. Standard of Review

{¶ 10} The well-established standards governing BZA appeals are as follows:

* * * "R.C. Chapter 2506 governs appeals to the courts of common pleas from final orders of administrative officers and agencies of political subdivisions, including municipal boards of zoning appeals. R.C. 2506.04 governs the standard of review the trial court must apply in such an appeal. It provides that 'the court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record.' The statute further provides that the court's judgment may be appealed by any party to the court of appeals 'on questions of law.' " *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 22,

quoting R.C. 2506.04.

"The common pleas court considers the 'whole record,' including any new or additional evidence admitted under R.C. 2506.03 * * *." *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147, 735 N.E.2d 433 (2000). "Thus, R.C. Chapter 2506 confers on the common pleas courts the power to examine the whole record, make factual and legal determinations, and reverse the board's decision if it is not supported by a preponderance of substantial, reliable, and probative evidence." *Cleveland Clinic* at ¶ 24, citing *Dudukovich v. Lorain Metro. Housing Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979).

In contrast, the court of appeals has a standard of review that is "more limited in scope." *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984). The court of appeals may "review the judgment of the common pleas court only on 'questions of law,' which does not include the same extensive power to weigh 'the preponderance of substantial, reliable and probative evidence,' as is granted to the common pleas court. Within the ambit of 'questions of law' for appellate court review would be abuse of discretion by the common pleas court." *Id.* at 34, fn. 4, quoting R.C. 2506.04.

An " 'abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. * * * It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."

*AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*,

50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

*Penewit v. Spring Valley Bd. of Zoning Appeals*, 2d Dist. Greene No. 2019-CA-6, 2019-Ohio-3200, ¶ 18-21.

### III. Analysis

**{¶ 11}** West Main's sole assignment of error states:

THE TRIAL COURT ERRED BY IMPROPERLY FINDING THAT THE CITY OF TROY PLANNING COMMISSION AND BOARD OF ZONING APPEALS LACKED THE AUTHORITY TO MODIFY THE REUSE AND RESCUE PLANS SUBMITTED BY 116 WEST MAIN, LLC UNDER TROY CODIFIED ORDINANCE SECTION 1143.22(F)(10), (22), AND (23).

**{¶ 12}** West Main raises three arguments in support of its appeal. First, it contends the Planning Commission and BZA may consider an application for a certificate of appropriateness submitted without a rescue plan satisfying Troy Zoning Code 1143.22(f)(10)(B)(2)(I). Second, it claims Troy Zoning Code 1143.22 authorizes the Planning Commission and the BZA to modify rescue and reuse plans that are unsatisfactory. Third, it asserts that an applicant seeking to demolish an entire structure under Troy Zoning Code 1143.22(f)(10)(B)(3) may satisfy the application requirements without providing cost and value estimates verified by a certified architect or engineer.

### A. Governing Code Provisions

**{¶ 13}** We begin our analysis with a review of the pertinent code provisions. Troy Zoning Code 1143.22(f)(10)(B) governs West Main's request to demolish the Tavern

building.[1]  It provides:

> A demolition permit shall not be issued unless accompanied by an approved certificate of appropriateness. The Planning Commission may only approve a certificate of appropriateness if:
>
>> 1. The applicant has given clear evidence that two or more of the following conditions exist:
>>
>>> I) The structure has incurred extensive damage to its basic structural elements such as the roof, walls, and foundation requiring substantial reconstruction and presenting an immediate danger to the public safety as declared by the Chief Building Officer.
>>>
>>> II) The structure is listed as non-qualifying or is not consistent with other structures in the historic district in terms of historic character, architectural style, construction material, height, setback or mass.
>>>
>>> III) The square foot cost of meeting the minimum building code would exceed the square foot market value of similarly used and improved structures in the historic district.
>>>
>>> IV) The structure is contributing and has been declared a

---

[1] Troy Zoning Code 1143.22 appears to have been substantially revised on September 6, 2022 through the passage of Ordinance 42-2022. For purposes of our analysis, we are applying the version in effect at the time of the Planning Commission's and the BZA's action on West Main's application for a certificate of appropriateness. That version of the pertinent code provisions is part of the administrative record.

public nuisance and its removal will not adversely affect the architectural or historic integrity of the streetscape.

2. The applicant has submitted a rescue plan that mitigates any adverse effects of the proposed removal upon the property, the streetscape, and the historic district through:

I) New construction that is consistent with the Architectural Design Standards and which contributes to the architectural or historic integrity of the historic district.

II) Exterior rehabilitation or restoration of the remaining structure that is consistent with the architectural design standards and which contributes to architectural or historic integrity of the streetscape.

III) Landscaping the parcel consistent with the Architectural Design Standards, providing for its care as common space for the benefit of the general public and relocating the remaining structure in an appropriate setting or preserving of the salvageable architectural materials.

IV) Posting a performance bond with the Zoning Administrator sufficient to insure completion of the reuse plan or has requested and received a waiver of these requirements from the Planning Commission.

V) If no alternatives or mitigation is possible and the

undertaking's benefits in relation to the significance of the property justify demolition as an acceptable loss, the Planning Commission may consider other appropriate reuse plans.

3. If seeking to demolish an entire structure or major portion thereof, the applicant shall also submit with the application, definite plans for reuse of the site, evidence of commitment for funding of the new project, a time frame for project initiation and completion and an assessment of the effect such plans will have on the character and integrity of the listed property or district.

I) The Planning Commission will be guided in the decision thereon by balancing the historic, architectural and cultural value of the structure or architectural feature and the purposes of this Section and of the Section pertinent to the subject property against applicant's proof of any unusual and compelling circumstances or substantial economic hardship in retaining the structure or architectural feature and the merit of the replacement project.

II) Upon the Planning Commission's determination that any such structure or architectural feature is not historically or architecturally significant or otherwise worthy of preservation, a certificate of appropriateness will be issued. The applicant may then apply for and be issued a demolition permit.

{¶ 14} Troy Zoning Code 1143.22(f)(11) then provides specific criteria to evaluate "substantial economic hardship." It states:

All of the following criteria shall be considered by all applicants and forwarded to Planning Commission to determine the existence of a substantial economic hardship:

A. Denial of a certificate will result in a substantial reduction in the economic value of the property.

B. The square foot cost of meeting the minimum building code would exceed the square foot market value of similarly used and approved structures in the historic district as verified by a certified architect or engineer.

C. No reasonable alternative exists consistent with the architectural standards and guidelines for the property.

{¶ 15} Similarly, Troy Zoning Code 1143.22(f)(12) provides specific criteria to assess "unusual and compelling circumstances." It states:

All of the following criteria shall be considered by all applicants and forwarded to Planning Commission to determine existence of unusual and compelling circumstances:

A. The property has little or no historical and architectural significance.

B. The property cannot be reasonably maintained in a manner consistent with the pertinent architectural standards and guidelines.

C. No reasonable means of saving the property from deterioration, demolition or collapse other than applicant's proposal exists.

{¶ 16} Finally, Troy Zoning Code 1143.22(f)(23)(B), which the BZA cited as the source of its "modification" authority, empowers that administrative body to approve an application for a certificate of appropriateness, to deny such an application, or to approve the application "subject to modification."

**B. West Main Failed to Satisfy "Rescue" and "Reuse" Code Requirements**

{¶ 17} By its own terms, the Troy Zoning Code did not authorize the Planning Commission to issue West Main a certificate of appropriateness to demolish the Tavern building unless: (1) West Main showed that at least two of four enumerated conditions existed, as required by Section 1143.22(f)(10)(B)(1); (2) West Main submitted "a rescue plan that mitigates any adverse effects of the proposed removal upon the property, the streetscape, and the historic district," as required by Section 1143.22(f)(10)(B)(2); and (3) West Main submitted "definite plans for reuse of the site, evidence of commitment for funding of the new project, a time frame for project initiation and completion and an assessment of the effect such plans will have on the character and integrity of the listed property or district," as required by Section 1143.22(f)(10)(B)(3).

{¶ 18} In its decision upholding the Planning Commission's issuance of a certificate of appropriateness, the BZA explicitly found that West Main had not met the last two requirements. The BZA found that West Main's proposed plans had "failed to sufficiently and fully mitigate the adverse effect of the proposed removal upon the property, the street scape, and the historic district as required by Section

1143.22(f)(10)(B)(2)." *See* November 18, 2021 BZA Decision at p. 3. With regard to West Main's proposed reuse plan, the BZA also explicitly found: "The Applicant's reuse plan, as modified before being put to a vote by the Planning Commission, was to demolish the entire structure and replace it with a seed and straw lot for development and, although that reuse plan was based upon a seed and straw lot, it did not provide definite plans for reuse of the site as required by Section 1143.22(f)(10)(B)(3)." *Id.*

{¶ 19} Despite literally finding non-compliance with two of the three prerequisites for a certificate of appropriateness, the BZA nevertheless upheld the issuance of a certificate by purporting to exercise its authority under Section 1143.22(f)(23)(B) to "modify" West Main's application. The BZA specifically modified the application "to address the requirements of Sections 1143.22(f)(10)(B)(2) and (3)." *Id.* It did so by directing West Main to apply within 90 days for a certificate of appropriateness for the construction of a replacement structure. The BZA advised that this new application "shall also address the considerations for a definite plan of reuse of Section 1143.22(f)(10)(B)(2)(I) through Section 1143.22(f)(10)(B)(2)(V)."[2] *Id.* at p. 4. The BZA added that "because the new construction would follow the application to demolish an entire structure, the new application shall address the considerations of Section 1143.22(f)(10)(B)(3)." *Id.* As noted above, these considerations include things lacking from West Main's proposed seed-and-straw plan—namely "definite plans for reuse of the site, evidence of commitment for funding of the new project, a time frame for project

---

[2] "Section 1143.22(f)(10)(B)(2)(I) through Section 1143.22(f)(10)(B)(2)(V)" actually address the requirements for rescue plans, not reuse plans. We presume that "plan of rescue" is what the BZA meant.

initiation and completion and an assessment of the effect such plans will have on the character and integrity of the listed property or district."

{¶ 20} In essence, the BZA's "modification" involved overlooking or setting aside its own explicit findings regarding West Main's non-compliance with prerequisites to demolition found in Section 1143.22(f)(10)(B)(2) and (3) and directing West Main to fulfill those prerequisites in the future, potentially after the Tavern building is razed, in connection with an application to construct a replacement building. In reversing the BZA's decision, the trial court correctly held that the BZA could not ignore unfulfilled prerequisites to a certificate of appropriateness by characterizing them as "modifications" and allowing West Main to satisfy them in the future. The practical effect of the BZA's decision was not to modify West Main's application, but instead, to impermissibly modify the requirements of the Troy Zoning Code governing the issuance of a certificate of appropriateness.

### C. West Main's Arguments are Unpersuasive

{¶ 21} In opposition to the foregoing analysis, the first issue West Main raises is whether the Planning Commission and the BZA could "consider" its application for a certificate of appropriateness to demolish the Tavern building in the absence of a proposed rescue plan satisfying Section 1143.11(f)(10)(B)(2)(I).

{¶ 22} We recognize, of course, that the Planning Commission and the BZA did "consider" West Main's application despite its perceived deficiencies. West Main's real argument appears to be that the Planning Commission and the BZA were authorized to approve its application even without a rescue plan addressing proposed new

construction. As detailed above, Section 1143.11(f)(10)(B)(2) obligates an applicant to submit a rescue plan that "mitigates any adverse effects of the proposed removal upon the property, the streetscape, and the historic district through" the following:

I) New construction that is consistent with the Architectural Design Standards and which contributes to the architectural or historic integrity of the historic district.

II) Exterior rehabilitation or restoration of the remaining structure that is consistent with the architectural design standards and which contributes to architectural or historic integrity of the streetscape.

III) Landscaping the parcel consistent with the Architectural Design Standards, providing for its care as common space for the benefit of the general public and relocating the remaining structure in an appropriate setting or preserving of the salvageable architectural materials.

IV) Posting a performance bond with the Zoning Administrator sufficient to insure completion of the reuse plan or has requested and received a waiver of these requirements from the Planning Commission.

V) If no alternatives or mitigation is possible and the undertaking's benefits in relation to the significance of the property justify demolition as an acceptable loss, the Planning Commission may consider other appropriate reuse plans.

{¶ 23} Items II and III appear to have little or no applicability insofar as they address the "remaining structure," and West Main sought to demolish its entire building. Item IV is

non-substantive as it involves posting a performance bond. But the trial court found that West Main should have submitted a rescue plan addressing Item I, new construction that is consistent with the historic district, thereby mitigating the effect of demolishing the Tavern building. West Main counters that it was not required to address Item I in a rescue plan because Item V exempted it. West Main essentially reads Item V as creating an exception or alternative to Items I through IV.

{¶ 24} For present purposes, we need not decide whether an applicant ever may rely on Item V to forego addressing potential new construction in a proposed rescue plan. In its own decision, the BZA specifically found that West Main had "failed to sufficiently and fully mitigate the adverse effect of the proposed removal upon the property, the street scape, and the historic district as required by Section 1143.22(f)(10)(B)(2)." *See* November 18, 2021 BZA Decision at p. 3. In other words, the BZA found that West Main did not satisfy the "rescue plan" requirements of the zoning code. As set forth above, the BZA also directed West Main to submit a future application for construction of a new building addressing "the considerations for a definite plan of reuse [sic] of Section 1143.22(f)(10)(B)(2)(I) through Section 1143.22(f)(10)(B)(2)(V)." *Id.* at p. 4. In light of these "modifications" made by the BZA, that administrative body plainly declined to find that new construction was not a possible means of mitigation. Indeed, the BZA specifically directed West Main to address new construction under Section 1143.22(f)(10)(B)(2)(I) in a future filing. Therefore, even if a hypothetical applicant conceivably could rely on Section 1143.22(f)(10)(B)(2)(V) to avoid addressing new construction under Section 1143.22(f)(10)(B)(2)(I), the BZA's decision makes clear that West Main is not such an

applicant.

{¶ 25} In a second argument, West Main insists that the Planning Commission and the BZA properly "modified" rescue/reuse plans accompanying West Main's application that were found to be deficient. Specifically, West Main notes that Section 1143.22(f)(22) authorizes the Planning Commission to "approve, modify, or disapprove" an application for a certificate of appropriateness, and that Section 1143.22(f)(23) empowers the BZA to do the same. West Main argues that the trial court's holding renders this modification language meaningless and "foreclose[s] any opportunity for an applicant to correct or modify a less than desirable reuse or rescue plan." In its reply brief, West Main rhetorically asks: "What could 'modify' or 'approving subject to modification' possibly mean if it does not mean that the Planning Commission and BZA can modify the details of an application?" According to West Main, "[t]he interpretation demanded by Evil Empire would render 'modify' and "modification' as surplusage, again violating the whole text canon and presumption against surplusage."

{¶ 26} In our view, West Main overstates the impact of the trial court's holding. The trial court simply recognized that the BZA could not overlook West Main's failure to satisfy explicit zoning-code prerequisites to the issuance of a certificate of appropriateness, grant West Main the certificate to demolish its building, and allow West Main to satisfy the prerequisites later—all in the name of exercising its power to "modify" an application. We agree with the trial court that the BZA's action effectively modified the zoning code, not West Main's application.

{¶ 27} Nor are we persuaded that the trial court's holding renders the Planning

Commission's and the BZA's modification power meaningless or surplusage. It is one thing to modify an application for a certificate of appropriateness, which might be done by imposing an endless variety of conditions or limitations on a particular project. It is an entirely different thing to "modify" an application by finding that an applicant failed to satisfy the requirements for a certificate of appropriateness and then granting the certificate anyway. Finally, contrary to West Main's argument, nothing in this opinion or the trial court's ruling precludes an applicant itself from correcting an application for a certificate of appropriateness. We have not addressed that issue because West Main did not modify its own application.

{¶ 28} In a final argument, West Main challenges an apparent finding by the trial court that it was required to submit cost and market-value estimates "verified by a certified architect or engineer."

{¶ 29} After finding the BZA's decision subject to reversal due to West Main's failure to satisfy the zoning-code prerequisites discussed above, the trial court further addressed West Main's lack of "definite plans for reuse of the site," which was a reuse-plan requirement under Section 1143.22(f)(10)(B)(3). The trial court quoted Section 1143.22(f)(10)(B)(3)(I), which provides that when considering a reuse plan submitted in connection with an application to demolish an entire structure, the Planning Commission should balance "the historic, architectural and cultural value of the structure" against the "applicant's proof of any unusual and compelling circumstances or substantial economic hardship in retaining the structure * * * and the merit of the replacement project."

{¶ 30} The trial court then looked to Section 1143.22(f)(11), which identifies three

criteria to assess "substantial economic hardship." Section 1143.22(f)(11) states that "[a]ll of the following criteria *shall be considered by all applicants and forwarded to Planning Commission* to determine existence of a substantial economic hardship." (Emphasis added.) The trial court focused on the second of the three criteria, which states: "The square foot cost of meeting the minimum building code would exceed the square foot market value of similarly used and approved structures in the historic district as verified by a certified architect or engineer."

{¶ 31} The trial court observed that West Main had submitted various estimates in the administrative proceedings but that they had not been verified by an architect or engineer. The trial court seems to have cited this deficiency as another basis to reverse the BZA's decision. On appeal, West Main asserts that the specified criteria are not mandatory, conjunctive elements that must be "satisfied" before a certificate of appropriateness may be issued. Rather, West Main contends the unusual-and-compelling-circumstance criteria found in Section 1143.22(f)(12) and the substantial-economic-hardship criteria found in Section 1143.22(f)(11) simply are factors to be considered when evaluating a reuse plan.

{¶ 32} Upon review, we decline to decide whether the lack of a certified architect or engineer's verification of cost and value estimates would constitute independent grounds for the Planning Commission to find no substantial economic hardship and to reject an application for a certificate of appropriateness containing a definite reuse plan. The trial court's analysis of this issue was unnecessary given that the BZA's decision already was subject to reversal based on West Main's failure to satisfy other more basic

application prerequisites, including its non-submission of a definite reuse plan at all. In light of West Main's failure to submit a definite reuse plan with its application for a certificate of appropriateness, we have no occasion now to decide whether such an application may be rejected if a definite reuse plan is submitted but is not accompanied by verified cost and value estimates.

{¶ 33} In finding it unnecessary to resolve the foregoing issue, we note too that under Section 1143.22(f)(10)(B)(3)(I), an applicant seeking to demolish an entire structure may submit "proof of any unusual and compelling circumstances *or* substantial economic hardship in retaining the structure[.]" (Emphasis added.) Under Section 1143.22(f)(11), cost and value estimates verified by a certified architect or engineer are relevant only to an applicant's proof of substantial economic hardship. Verified estimates are neither required nor relevant if an applicant seeks only to demonstrate the existence of unusual and compelling circumstances under Section 1143.22(f)(12). For this additional reason, we decline to render what at this point effectively would be an advisory opinion regarding the proper interpretation of Section 1143.22(f)(11).

{¶ 34} Having found no error or abuse of discretion in the trial court's reversal of the BZA's decision approving West Main's application for a certificate of appropriateness to demolish the Tavern building, we overrule West Main's assignment of error.

## IV. Conclusion

{¶ 35} The judgment of the Miami County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.